Nancy L. MOORE, et vir., Thomas Moore, Appellants,

v.

POLISH POWER, INC., Ernest Romanowski and Harold Romanowski d/b/a Polish Power Enterprises and L.D. Brinkman & Co. (Texas, Inc.), Appellees.

No. 05–85–01287–CV.

Court of Appeals of Texas, Dallas.

Oct. 28, 1986.

Rehearing Denied Dec. 3, 1986.

Bertran T. Bader, III, Dallas, for appellants.

Mark C. Enoch, Kevin J. Keith, C. Edward Fowler, Jr., Dallas, for appellees.

Before VANCE, WHITHAM AND HUGHES [1], JJ.

WHITHAM, Justice.

In this personal injury case tried before the court, appellants, Nancy L. Moore and Thomas Moore, appeal a take-nothing judgment in favor of appellees Polish Power, Inc., Ernest Romanowski and Harold Romanowski, individually and doing business as Polish Power Enterprises (Polish Power), and L.D. Brinkman & Co. (Texas Inc.) (Brinkman). The principal issue involves an evidentiary ruling made by the trial court in an aborted jury trial immediately before the bench trial. The trial court's evidentiary ruling precipitated the bench trial. The parties treat Brinkman's objection to the evidence and the trial court's ruling on that objection as part of the non-jury trial. We treat the objection and trial court ruling in the same manner. We conclude that the trial court erred in excluding the evidence. We conclude further that the trial court's error was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R. APP.P. 81(b)(1). Accordingly, we reverse and remand.

We begin by reference to our Supreme Court's decision in *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729 (Tex.1984). In a personal injury case, the plaintiff typically alleges that the defendant's conduct caused an event—an automobile accident, a fall, or in this case, the release of chemical fumes—and that this event caused the plaintiff to suffer injuries for which compensation in damages should be paid. *Morgan*, 675 S.W.2d at 731. Thus, at trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries. *Morgan*, 675 S.W.2d at 731. In *Morgan*, the court held that a default judgment admits that the defendant's conduct caused the event upon which the plaintiff's suit is based. *Morgan*, 675 S.W.2d at 732. There was no default judgment in the present case. Therefore, Brinkman insists that Moore must show that Brinkman's conduct caused the event in issue—the release of formalde-

1. The Honorable W.A. Hughes, Justice, retired, Second Court of Appeals, Fort Worth, sitting by assignment.

hyde fumes in Moore's home. Absent that showing, Brinkman asserts that directed verdict was proper. Moore argues that she did show that Brinkman's conduct caused the event in issue—the release of formaldehyde fumes in her home—and, therefore, directed verdict was improper. We agree with Moore.

At this point, we describe the procedural aspects of the present case. Moore alleged that she purchased carpet and carpet pad from Polish Power which was installed in the Moore residence by Polish Power. Polish Power purchased the carpet and carpet pad from Brinkman. Moore alleged further that the carpet and carpet pad emitted or "off-gassed" formaldehyde, causing her neurological and muscular problems. Moore asserted three causes of action; first, strict tort liability; second, negligence; and third, breach of implied warranties of merchantability under TEX.BUS. & COM.CODE ANN. § 2.314 (Vernon 1968). Jury trial commenced October 7, 1985. Before that date, on September 9, 1985, Brinkman filed a motion to exclude certain deposition testimony of Moore's witness, Dr. Donald Sprague. In its motion, Brinkman objected to Sprague's testimony:

> [R]elating to any characteristics of the carpet provided by Defendant L.D. Brinkman to Defendant Polish Power which was subsequently sold to Plaintiff Moore, including but not limited to the formaldehyde content, formaldehyde emission rate and issue as to whether the carpet in question is unreasonably dangerous be excluded from the hearing of the jury in the trial of this matter.

Brinkman's motion did not otherwise identify the Sprague testimony sought to be excluded. On October 7, 1985, after the jury was seated, the trial court granted Brinkman's motion to exclude. The excluded evidence is as reflected in the trial court's following order:

> After hearing, IT IS ORDERED that the motion to exclude testimony of defendant L.D. Brinkman & Co. (Texas), Inc., filed October 3, 1985, [sic] is granted, and the following deposition testimony of Dr. Donald E. Sprague is excluded:
>
> page 9, line 23—page 11, line 14;
> page 12, lines 7–23;
> page 13, line 5—page 14, line 25;
> page 15, lines 4–25;
> page 18, line 7—page 20, line 13;
> page 26, lines 10–23;
> page 35, lines 1–6;
> page 57, lines 16–22; and
> page 75, lines 16–21.
>
> Signed: October 7, 1985.

Sprague's excluded testimony follows:

*Page 9, line 23 through page 11, line 14*

Q Following the examination and test or testing done, Doctor, were you able to come to an opinion or conclusion as to in reasonable probability what was ailing this lady?

A Well, the one thing that struck me was that the only real change that had occurred in her environment was that she had new carpet put in the house approximately a month before the symptoms began; otherwise, she had been fairly stable—she was an allergic person and had had a lot of difficulty in the past but she was coping, and approximately a month after that happening, her health began to deteriorate markedly and she began the merry-go-round that she was on when I saw her.

What was the rest of that question or does that answer it?

Q Were you able to come to an opinion or conclusion as to what her problem was?

A Yes.

Q What was that opinion, please, sir?

A I felt that the exposure to the carpet was what triggered the symptomology that she came to me with and that she had been suffering with prior to—you know, prior to seeing us and was probably responsible for the whole clinical picture that she was undergoing at the time.

Q Doctor, what, in your opinion, was it about the carpet that was the cause of the

clinical picture you were seeing at that time in your opinion?

A I think probably the largest problem with the carpet was the formaldehyde off-gassing that occurs with new carpet for two to three years. There are probably other chemicals involved, the formaldehyde being the major one.

Q Doctor, from you[r] experience in environmental medicine, have you come to know what certain types of synthetic carpets are made with formaldehyde in their processes?

A Yes, synthetic carpets, particularly Dacron, nylon, things along that line. You don't see this in like Persian carpets, things that are hand woven [sic]. You don't see it in wool but you do find it most frequently in synthetic carpet.

*Page 12, lines 7–23*

Q What is it about formaldehyde, Doctor, as it's used in manufacturing these carpets, the nature of the product as used, that causes it to emit formaldehyde vapors once it's put down?

A I'm not exactly sure. Well, first off, I don't know that putting it down is what the problem is. The formaldehyde, I think, is used in the actual construction of the material from which the carpet is made. As the carpet manufacturers we've talked to deny the use of formaldehyde, but nevertheless we measure the carpet for formaldehyde and it's present.

There are two things that occur. Number one, the padding under the carpet is usually urea formaldehyde foam rubber and off-gases [sic] formaldehyde for a number of years, and the carpet itself will off-gas formaldehyde usually in the range of .03 or .05 parts per million for about three years.

*Page 13, line 5 through page 14, line 25*

Q I would ask you, Doctor, are there other products that are used in the home that also are made with formaldehyde that give off free formaldehyde?

A There is [sic] a number of products.

Q Like what?

A Particle board is probably the biggest single emitter that we find. It will off-gas formaldehyde for twenty years, as long as it's got any form. Paneling will usually off-gas formaldehyde for about a year and-a-half. Plywood, the indoor-type plywood with a urea formaldehyde glue. The problem basically is the urea formaldehyde molecule is really unstable and it will break down under the influence of moisture in the air to off-gas free formaldehyde. There are other formaldehyde products that aren't near so unstable. Indoor/outdoor plywood is made with phenol formaldehyde and it's fairly safe.

One of the other problems with these products is that they push these reactions to completion by using excess formaldehyde. Particle board, for instance, will off-gas free formaldehyde for a year and then this breaking down process begins. Insulation, when we first became aware with the fact that formaldehyde could cause problems with the urea formaldehyde foam insulation and that opened the door to the realization that there were a lot of other products in the home that had that same problem.

Q Let me ask you to assume, Doctor, that the presence in this lady's home of not particle board but wood veneer paneling that was in the home in October of 1975, when they first moved in, in your opinion in November of 1979, would that product likely be giving off free formaldehyde into the air in any significant quantities?

A Not that period of time. Usually about a year to a year and-a-half is what it takes for paneling to off-gas. First off, it's not very porous and it's not very thick and it usually doesn't cover near the surface area that carpet will.

Q Doctor, do you have an opinion as to whether or not the condition that you saw and treated this lady for that you gave us your opinion as to earlier was caused by free formaldehyde being given off the carpet that was installed November, '79?

A Yes, I think that was the large contributing cause.

Q What is that opinion?

*Page 15, lines 4–25*

Q Let me ask you this, Doctor: Then assuming your knowledge, training, and experience, history, physical exams and the diagnostic testing on this lady including history of installation of this synthetic carpet in November of 1979, I would ask you to assume the following definition of producing cause, the definition being that cause with which one or more other causes produces an event, and without which such event would not have occurred when it did, and ask you, sir, if you have an opinion as to whether or not the carpet installation, in giving off a formaldehyde in November of 1979, was a producing cause of this lady's problem?

A Yes.

[BRINKMAN'S COUNSEL]: I object. Can I make an objection?

[MOORE'S COUNSEL]: Certainly.

[BRINKMAN'S COUNSEL]: I object to the form of the question and also to the fact it's calling for a legal conclusion on the part of the doctor.

Q [MOORE'S COUNSEL]: Your answer, please, Doctor?

A Yes.

*Page 18, line 7 through page 20, line 13*

Q Doctor, I would ask you to assume with your knowledge, training, and experience in the area, I'll ask you as to whether or not you have an opinion as to whether the carpet made such a matter with chemicals that would give off free formaldehyde in a home environment, would or would not be reasonably fit for use in that household environment?

[BRINKMAN'S COUNSEL]: I object to the form of the question and to the legal conclusion which is called for on the part of the witness.

Q [MOORE'S COUNSEL]: First, do you have an opinion?

A I lost the question. The question is do I feel that the carpet—

Q Let me state it this way, Doctor: I would ask you whether or not, based on your knowledge, training, and experience, do you have an opinion as to whether carpets, by virtue of their manufacturing process, when installed give off free formaldehyde, is that type of product reasonably fit for use by humans in households?

A I don't think so.

[BRINKMAN'S COUNSEL]: I'd like to make an objection, please. I object to the form of the question. I object to calling for a legal conclusion on the part of the doctor. I object to any opinions which the doctor makes or continues to make on carpet manufacturing and carpet processes as he has not been established as an expert in that area.

Q [MOORE'S COUNSEL]: My understanding, Doctor, you have an opinion in that regard?

A Yes.

Q What is that opinion?

A I think that the synthetic carpets are fairly toxic and I think that they are a problem and I think they're a problem to most people, and that everyone suffers to a greater or lesser degree. I don't think they're safe.

This is a very common problem that we see.

[BRINKMAN'S COUNSEL]: Objection. Nonresponsive. No question before the witness.

Q [MOORE'S COUNSEL]: Doctor, let me ask you this: In your practice, is [sic] the history and symptoms related to you by Mrs. Moore and your resulting diagnosis rare or unusual?

A No, it's not unusual at all. The extent to which it affected her, we've seen before but carpeting is one of the most common pollutants in the Metroplex area for sure that we've seen and it does cause a number of symptoms, not just central nervous system symptoms.

Q Let me, Doctor, if I could, shift gears, as it were, and get away from the—

A New carpet, by the way.

Q —the carpet aspects and let me concentrate a little bit on the chemical itself

and relate it particularly to Mrs. Moore, including what her symptoms are, how your treatment has progressed, and where we are now, if I could, sir. I would ask you, sir, what is it[?]

*Page 26, lines 10–23*

A [I]n this area where most of the office buildings are fairly new and closed ventilation with a lot of carpet, particle board, cigarette smoke, and the whole nine yards. I know you heard the term the sick building syndrome. Essentially what she's got is what we call the 20th century syndrome, where the chemical pollutants that we live with normally are a level to which she cannot function in, and when you talk about the work environment in this area particularly, it's extremely polluted and I think she will have difficulty finding a job or a work environment that she could function in because of people smoking, because of carpet, because of particle board cubicle dividers, because of the pesticiding practices that occur in this area, on down the line.

*Page 35, lines 1–6*

A The first thing was the carpet would have to go and we would recommend hard surface floors, whether they be tile, terrazzo, or hardwood. We would recommend an air handling system that was capable of pulling out chemical pollution. Usually these are a series of charcoal filters.

*Page 57, lines 16–22*

A [The] thing that I find significant is that her health at the time, according to the history, was stable, had been for several years up until a month after she put the carpet in, and that's basically—that's what I was basing my diagnosis—not my diagnosis but my prognosis on, was the fact that she had been fairly stable for a number of years and then went down the tubes. She had a long—

*Page 75, lines 16–21*

A Yeah, I think the mobile home business is significant. I think it might well have set the stage for the rapidity with which she got ill after she got exposed to carpet, although I've seen people in two or three months get done in with carpet, but

that history would certainly have pre-disposed her to it.

Brinkman advanced these two reasons for its objection:

(1) Dr. Sprague is not qualified as an expert in the area of carpeting manufacture and composition, more specifically, formaldehyde content, of the carpet in question; and

(2) Dr. Sprague has no personal knowledge of facts learned elsewhere on which to base his opinions as to the characteristics of the carpet in question, and more specifically, the formaldehyde content of said carpet.

Brinkman supported its reasons for its objection by directing the trial court to Sprague's deposition testimony as follows:

*Page 79, Line 24*

Q You've never had any training in the testing of carpet; have you?

A No.

Q Or its contents?

A For formaldehyde, is that what you mean?

Q Anything about carpet content.

A No.

*Page 68, Line 4*

Q Have you ever done any testing on any of the carpet that Mrs. Moore had in her house or on any of the panelling that was in her house?

A No, I haven't.

Q Do you know anyone who has? I mean, have you seen any results of any of that?

A I don't recall offhand if she had that house tested for formaldehyde or not. I haven't seen the results. I don't recall if she had it done. . . .

*Page 68, Line 19*

Q So the answer is no, you don't have any of that tested, her carpet or the panelling in question?

A No.

Q You have no personal knowledge as to the formaldehyde contents of any of those items; do you?

A Not in her home.

Following the exclusion of Sprague's testimony, Moore's counsel advised the trial court that "in light of the Court rulings ... [Moore] has no evidence of causal link, and instructed verdict would be proper." To expedite matters, and in the interest of judicial economy, it appears that the case was then tried before the court on this basis:

> [MOORE'S COUNSEL]: I would like to have the record reflect that the deposition testimony of Doctor Sprague is the only testimony that plaintiff intended to call with regard to certain elements of plaintiff's case including causation, merchantability and product defect. And for—in light of the ruling of the Court to which plaintiff does except, that it is obvious that at the close of the evidence an instructed verdict would be rendered. Therefore, to save the time and effort of the facade of a trial before the jury it was suggested by counsel for plaintiff that another procedure be instituted and therefore it is the, well, what is to be accomplished is that the jury is to be discharged and that we are going to proceed before the Court by introducing as exhibits certain Exhibits and deposition testimony which will be plaintiff's case. Anything you want to add, [Brinkman's Counsel]?
>
> [BRINKMAN'S COUNSEL]: No.
>
> [MOORE'S COUNSEL]: Judge, my understanding is you want to do it before you bring the jury in and discharge them?
>
> THE COURT: Right.

Moore's exhibits and deposition testimony were introduced and admitted, including Sprague's deposition and the deposition of Brinkman's chemistry expert, John Lynch. It further appears that the parties agreed as to what Brinkman's witness, Thomas Moore, would testify.

█ We have noted that at the "bench trial" Sprague's deposition was admitted into evidence. Brinkman did not object to the admission of Sprague's deposition on this occasion. Indeed, during the friendly accommodating procedure at the "bench trial", Brinkman's counsel remarked, "[f]or the limited purpose only of this record, Your Honor, we have no objections to the previous Exhibits offered." Nevertheless, we treat, as do all counsel on appeal, Brinkman's September 9, 1985, objection to Sprague's testimony as applicable to, and made during, the "bench trial"; and the trial court's pre-"bench trial" ruling of October 7, 1985, on the admissibility of Sprague's testimony as applicable to, and made during, the "bench trial". For this court to do otherwise, and hold that Sprague's testimony, offered without objection at the "bench trial", was in evidence, would make a mockery of the efforts of able counsel for both parties to save the trial court's valuable time. We decline to do so. Instead, we commend their professional approach. Therefore, we treat the case before us as one in which Brinkman stated its objections to Sprague's testimony in the language of its September 9, 1985 motion to exclude and the trial court sustained the objection to the extent expressed in the trial court's order of October 7, 1985.

After the parties had made their "bench trial" record, Brinkman moved for an instructed verdict, Polish Power adopted the Brinkman motion and the trial court granted the joint motion. The record indicates that during the "bench trial" the jury had been waiting in the jury room and had heard nothing of the evidence. The record also reflects that the parties waived jury trial, that the trial court instructed Brinkman's counsel to prepare a form of judgment and that the trial court "informally ... turned the jury loose." With this background, we reach the propriety of the trial court's evidentiary ruling and its instructed verdict against Moore.

In her first point of error, Moore contends that the trial court erred in excluding Sprague's testimony because his opinions were admissible under TEX.R.EVID. 702 and 703. Rule 702 reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

With these rules before us, we summarize the evidence relied upon by Moore to allow Sprague's testimony. Sprague is a medical doctor licensed in the State of Texas and a fellow in the American Academy of Environmental Medicine. Sprague is board certified in the American Academy of Family Practice, a member of the American Academy of Preventive Medicine and other societies. Sprague has been a physician since 1972 and practices in the specialty of environmental medicine which he defined as "the study of the impact of the environment as a whole on the body." He has practiced environmental medicine since about 1975. Sprague has a background in aerospace medicine, is an aviation medical officer with the United States Navy and has been a senior medical examiner with the Federal Aviation Administration for ten years. As a senior medical examiner for the Federal Aviation Administration for that period of time, Sprague has done all classes of pilot medicals including first class. Sprague has measured carpet and detected the off-gassing of formaldehyde. Sprague's clinic is known as the Environmental Health Center of Dallas. Sprague has spoken at conferences and presented approximately twelve papers about formaldehyde over the last five years. Sprague has had experience with patients who have had problems with formaldehyde exposure because of living in mobile homes and has performed a study involving forty patients affected by formaldehyde. Sprague has obtained information regarding formaldehyde exposure from Dr. Thad Godisch in charge of the Environmental Department of Ball State University, Dr. Zamm from California and Bruce Small, a physical engineer from Canada. Sprague testified about studies he has relied upon in giving his opinions including an allergy immunology textbook pending publication in England, a textbook called *Clinical Ecology* by Dr. Dicky, "ten articles off-hand mentioning spreading phenomena", and some sixty articles written by Dr. Rae (also a member of the Environmental Health Center of Dallas). Further, Sprague stated that he assumed, based on his experience, that there was formaldehyde in the carpet and pad in question. Sprague testified that, based upon his examination, testing and treatment of Moore, she suffered chemical poisoning and damage to her immune system from exposure to formaldehyde. Sprague was of the opinion, based upon the history given by the patient as to the time of beginning of the symptoms, that the formaldehyde that was causing her problems was the result of "off-gassing" that occurs with new carpet for two or three years. Sprague was also of the opinion that: (1) carpets, which when installed give off formaldehyde, are not reasonably fit for use by humans in households; (2) synthetic carpets are fairly toxic; (3) synthetic carpets are a problem to most people; and (4) synthetic carpets are a source of suffering to everyone to a greater or lesser degree because they are not safe. In addition to Sprague's testimony, Moore also directs us to her exhibits thirty-two and thirty-three showing two tests for formaldehyde done by the City of Dallas in her home; one prior to the removal of the carpet and pad and the second after its removal. These tests show a thirty-seven and one-half percent (37½%) drop in the formaldehyde concentration in her home following removal of the carpet.

Moreover, Moore introduced the deposition of Brinkman's chemistry expert, John

Lynch, at the "bench trial". Lynch tested samples of the carpet and carpet padding in question. We quote Lynch's testimony:

Q. [MOORE'S COUNSEL]: All you were able to determine is that the carpet and padding, the indoor/outdoor type, when you tested it, was emitting some formaldehyde, free formaldehyde.

A. Yes.

Q. Likewise you were able to determine that the brown shag carpet was emitting some free formaldehyde.

A. Yes.

Q. And that the padding, the sample that you were supplied, was emitting some free formaldehyde.

A. Yes, sir.

Furthermore, the record in the "bench trial" contains opinion testimony by Sprague which is important to our disposition of the case. In the quotation from Sprague's deposition which immediately follows, the question and answer without underscoring appears on page fifteen and was excluded.

Q Let me ask you this, Doctor: Then assuming your knowledge, training, and experience, history, physical exams and the diagnostic testing on this lady including history of installation of this synthetic carpet in November of 1979, I would ask you to assume the following definition of producing cause, the definition being that cause with which one or more other causes produces an event, and without which such event would not have occurred when it did, and ask you, sir, if you have an opinion as to whether or not the carpet installation, in giving off a formaldehyde in November of 1979, was a producing cause of this lady's problem?

A Yes.

\*    \*    \*    \*    \*    \*

Q  And your opinion is?

A  My opinion is that formaldehyde was the cause of her problem.

Q  I will ask you, Doctor, as an environmental physician, would a product which would cause the emitting of free formaldehyde vapors in a home environment cause a health risk to certain humans?

A  Yes.

Q  To everybody?

A  Yes, it causes a health risk to everybody. The susceptibility is individual. Some people will be able to withstand that without getting in the condition that [Mrs. Moore] did.

■ In connection with this quotation, we point out that the underscored part of Sprague's above-quoted testimony is found on page sixteen of Sprague's deposition and was not excluded. By reference to the trial court's order of October 7, 1985 the reader will note that none of Sprague's testimony on page sixteen was excluded. Moreover, we do not read the underscored part of Sprague's above-quoted testimony to "relate to any characteristics of the carpet." Hence, we conclude that Brinkman made no objection in its motion to exclude to the underscored part of Sprague's above-quoted testimony. Thus, we have a record containing the quoted causal medical opinion.

■ The last sentence of rule 703 appears to be the focal point of the controversy between the parties. Moore maintains that the last sentence allows the trial court to admit Sprague's excluded testimony. Brinkman, on the other hand, while agreeing that rule 703 permits an expert to base his opinion upon facts or data reasonably relied upon by experts in his field and that the facts or data need not be admissible into evidence, argues that the record is completely devoid of any representation made by Sprague that his opinions were, in fact, based upon:

(1) Any facts or data relevant to the carpet and padding in question;

(2) Any identification as to what those facts or data were, upon which he was basing his opinion; and

(3) That other experts in his field would base their opinions upon such facts or data.

Under rule 703 an expert is able to base his opinion on inadmissible data only if the data is of a type reasonably relied upon by experts in the particular field. Sutton, *Ar-*

*ticle VII: Opinions and Expert Testimony*, 20 Hous.L.Rev. 445, 465 (1983 Tex.R. Evid.Handbook). Whether experts in the field reasonably rely on such data is a matter for preliminary determination by the trial court pursuant to TEX.R.EVID. 104(a). Sutton, 20 Hous.L.Rev. at 465. We conclude that the trial court erred as a matter of law in its implied finding concerning data relied upon by Sprague. We reach this conclusion based on the record as a whole. Appellate courts may look to the record as a whole in reviewing the trial court's preliminary determination. *See Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir.1980). From the record as a whole, we conclude that the data relied upon by Sprague is of a type reasonably relied upon by experts in the particular field. Therefore, we conclude that Sprague's testimony excluded in the trial court's October 7, 1985 order was admissible under rules 702 and 703 over the reasons given by Brinkman for the exclusion of the evidence in its September 9, 1985 motion to exclude.

■ We also conclude that the trial court erred in excluding Sprague's testimony in light of the interpretation given the federal hearsay rule which came to be adopted as the federal rule of evidence from which our rule 703 is taken. As stated in *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir.1971) (en banc), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1308, 31 L.Ed.2d 591 (1972):

> The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion. Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and ex-

perience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

We reason that the record in the present case reflects sufficient education, lifetime experience, consultation with numerous sources and use of the information obtained, and professional knowledge and experience to allow the admission of the excluded testimony into evidence. Therefore, we again conclude that Sprague's testimony excluded in the trial court's October 7, 1985 order was admissible under rules 702 and 703 over the reasons given by Brinkman for the exclusion of the evidence in its September 9, 1985 motion to exclude. Thus, we conclude further that the trial court erred in excluding the testimony.

■ It follows that the excluded evidence establishes the causal link between Brinkman's conduct and the release of formaldehyde fumes in Moore's home. We conclude that Sprague's excluded testimony together with his admitted testimony is proof that Brinkman furnished, and that Polish Power installed, carpet and carpet pad in Moore's home which contained formaldehyde. Moreover, we conclude further that Lynch's testimony and Moore's exhibits thirty-two and thirty-three are proof of the release of formaldehyde fumes in Moore's home from this carpet and carpet pad. Hence, we conclude further that in the present case Moore has adduced some evidence that Brinkman's and Polish Power's conduct caused an event—the release of formaldehyde fumes in Moore's home. *Morgan*, 675 S.W.2d at 731. Furthermore, we conclude that the underscored part of Sprague's above-quoted testimony is proof that the event—the release of formaldehyde fumes in Moore's home— caused Moore to suffer injuries for which compensation in damages should be paid. *Morgan*, 675 S.W.2d at 731. It follows, and we so hold, that at the "bench trial" Moore established the two causal nexuses required to be shown in order for her to recover. First, a causal nexus between Brinkman's and Polish Power's conduct and the event sued upon. Second, a causal

nexus between the event sued upon and Moore's injuries. *Morgan,* 675 S.W.2d at 731.

■ Aside from the evidentiary matters discussed in this opinion, Brinkman advances no additional reason in support of the directed verdict. Consequently, having held that the trial court erred in excluding the testimony, we conclude that the trial court erred in directing a verdict against Moore. Because she suffered a directed verdict, we conclude that Moore has met her burden to show that the trial court error in excluding Sprague's testimony resulted to her prejudice and contributed in a substantial way to bring about an unjust result. *See Wilson v. City of Port Lavaca,* 407 S.W.2d 325, 331 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.); *Klimist v. Bearden,* 374 S.W.2d 783, 785 (Tex.Civ. App.—Tyler 1964, no writ). Hence, we are of the opinion that the error amounted to such a denial of the rights of Moore as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case. Moreover, it appears to the court that the error affects the entire matter in controversy. TEX.R.APP.P. 81(b)(1). Consequently, we must remand the case to the trial court and order a new trial of the entire cause on the merits. We sustain Moore's first point of error. In view of our disposition of her first point, we need not address Moore's remaining two points of error.

We reverse the judgment of the trial court and remand the case to the trial court for a new trial of the entire cause on the merits.