93 S.W.3d 609 (2002)
In the Interest of J.B., A Child.
No. 10-01-044-CV.
Court of Appeals of Texas, Waco.
November 27, 2002.
*612 John W. Segrest, McLennan County Dist. Atty., James Wiley, McLennan County Asst. Dist. Atty., Waco, for Appellee/Respondent.
C. Kevin Keathley, Law Office of C. Kevin Keathley, Waco, for Ad Litem.
Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

OPINION
REX D. DAVIS, Chief Justice.
A jury recommended that Kaltina Spencer's parental rights be terminated with respect to her three-year-old son J.B. The court rendered judgment in accordance with the verdict. Spencer presents fifteen issues in this appeal. In the first, Spencer contends that the court erred by requiring her to proceed to trial with less than forty-five days' notice as required by Rule of Civil Procedure 245. Because this issue is dispositive, we will address only those of her remaining issues which we are required to or which are likely to arise on retrial.

BACKGROUND
J.B. was born on February 11, 1999. At the time, Spencer had a pending state jail felony theft charge. She was placed on community supervision for this offense on June 10. The court ordered her to serve 120 days in a state jail as a condition of her community supervision and had her immediately taken in custody. Spencer left J.B. in the care of his uncle. The uncle contacted the Child Protective Services Division of the Department of Protective and Regulatory Services ("CPS") the next day and asked the agency to take custody of J.B. A CPS investigator contacted Spencer at the McLennan County Jail regarding any alternate placements. Spencer could provide no alternatives for placement, so CPS initiated custody proceedings.
Spencer remained incarcerated until October 12. During her incarceration, she wrote two letters to the trial judge. In the second, she asked for a bench warrant so she could appear for an upcoming hearing. After her release, Spencer apparently remained in contact with the CPS caseworker assigned to J.B.'s case. Permanency progress reports filed by CPS in November 1999 and March 2000 reflect communications between Spencer and the caseworker. Spencer wrote the judge another letter on April 4 asking that J.B. be returned to her custody and expressing her willingness "to do what ever the court ask me to do to make this possible." CPS filed an amended petition on April 18 seeking termination of the parental rights of Spencer and J.B.'s father.
The court signed an interlocutory noanswer default judgment on June 8 terminating Spencer's parental rights. The court signed a separate order on that date extending the statutory dismissal date to December 16. See Tex. Fam.Code. Ann. § 263.401(b) (Vernon Supp.2002).
Spencer filed a motion to set aside the default judgment on September 7. Spencer alleged that the default judgment was improper because her letters to the judge constituted answers and she was not given notice of the trial setting. See Peralta v. Heights Med. Ctr., Inc., 485 U.S. 80, 86-87, *613 108 S.Ct. 896, 900, 99 L.Ed.2d 75, 82 (1988); Lopez v. Lopez, 757 S.W.2d 721, 723 (Tex.1988) (per curiam). The court granted Spencer's motion for new trial on September 12.
In the meantime, the court sent notice of trial on September 8. The notice informed the parties that the case was set for "final hearing" on October 23. CPS sent a follow-up notice on September 21 clarifying that the case would be heard on October 24. Spencer filed a motion for continuance on September 26 asking for additional time to prepare for trial because: (1) she did not receive the forty-five days' notice required by Rule of Civil Procedure 245; and (2) her counsel needed additional time to organize the "approximately 1,000 pages" of documents provided by CPS on September 21 and to conduct appropriate discovery. The court heard Spencer's continuance motion on September 29 and "grant[ed] the continuance until October 31st."
Spencer filed a second continuance motion on October 19, contending that the notice given by the court on September 29 of the October 31 setting still did not provide the forty-five days' notice required by Rule 245. The court heard this motion on October 24 and denied it. Spencer noticed depositions for three of CPS's witnesses on October 25. CPS filed a motion to quash these deposition notices the next day. The court heard this motion on October 27. At the hearing, Spencer made a third continuance motion again urging Rule 245 as the basis for the continuance. The court granted CPS's motion to quash and denied Spencer's third continuance motion that same day.
The parties proceeded to trial as scheduled on October 31. The jury returned its verdict on November 9. The court signed the decree on November 17.[1]

NO EVIDENCE
Spencer claims in her second issue that the record contains no evidence or factually insufficient evidence to support a finding that she knowingly placed or allowed J.B. to remain in dangerous conditions or surroundings.[2]
When we decide a "no evidence" point, we consider only the evidence and inferences which tend to support the contested issue and disregard all evidence and inferences to the contrary. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997). We will sustain a no evidence point if: (a) there is a complete absence of evidence of a vital fact; (b) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. Id. (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L.Rev. 361, 362-63 (1960)). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, `rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *614 Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.1995) (quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.1994)). We apply this standard of review in termination cases, which require proof by clear and convincing evidence, even though this standard was developed in preponderance-of-the-evidence cases. See In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.); Justice Bill Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 48 Baylor L.Rev. 391, 413 (1996).
When J.B. was three months' old, part of the roof of the house in which Spencer and he were living collapsed in a rainstorm. They "immediately moved out." They lived for a period of time in a local motel. An acquaintance of Spencer's testified that her motel room was "filthy." She would not have allowed her own children to live "in something like that." According to this witness's testimony, Spencer and J.B. lived in the motel room for a period of time, though she could not say how long.
The evidence regarding the condition of Spencer's motel room constitutes some probative evidence that Spencer knowingly allowed J.B. to remain in dangerous conditions or surroundings. Thus, we conclude that the no-evidence portion of Spencer's second issue is without merit. In view of our disposition of the no-evidence portion of Spencer's second issue, we need not address the no-evidence portions of her third and fourth issues.[3] In view of our disposition of Spencer's notice issue, we need not address those portions of her second, third and fourth issues which challenge the factual sufficiency of the evidence to support the verdict.

NOTICE OF TRIAL SETTING
Spencer argues in her first issue that reversal is required because she did not receive the notice required by Rule 245. We agree.
Rule 245 provides in pertinent part:
The Court may set contested cases on written request of any party, or on the court's own motion, with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties; provided, however, that when a case previously has been set for trial, the Court may reset said contested case to a later date on any reasonable notice to the parties or by agreement of the parties. Noncontested cases may be tried or disposed of at any time whether set or not, and may be set at any time for any other time.
Tex.R. Civ. P. 245.
Rule 245 requires that a party to a contested case receive "notice of not less than forty-five days" for a first trial setting. See id. The district clerk notified the parties on September 8 that the case was set for trial on October 23. The clerk sent this notice by facsimile machine and by certified mail, return receipt requested. This added three days to the forty-five provided by Rule 245. Id. 21a; Lewis v. Blake, 876 S.W.2d 314, 316 (Tex.1994) (per curiam). Thus, the trial could not have commenced before October 26. For this reason, the September 8 notice did not provide adequate notice of trial under Rule 245.
*615 CPS sent a letter to the attorneys in the case on September 21 notifying them that the trial would begin on October 24. Although the record does not indicate the manner in which this letter was served on counsel, the letter itself is dated only thirty-three days before the trial setting. Thus, it did not satisfy Rule 245.
The court heard Spencer's first motion for continuance on September 29. Apparently the court agreed that its initial notice did not satisfy Rule 245, because it granted Spencer's continuance motion in part. The court rescheduled Spencer's trial for October 31. Thus, the court gave Spencer thirty-two days' notice of the October 31 trial setting. This did not satisfy Rule 245.
Spencer's second and third continuance motions objected that the court's September 29 notice still did not satisfy Rule 245. CPS responded that under the combined notices Spencer had more than forty-five days notice (from September 8 to October 31) that her case would go to trial. The court apparently accepted this reasoning and denied Spencer's second and third continuance motions.
Rule 245 requires a minimum of fortyfive days' notice of the trial "setting." Id. 245. Notice that a case is going to trial does not equate to notice of when the case is going to trial. None of the notices in this case provided the required notice. See Bell Helicopter Textron, Inc. v. Abbott, 863 S.W.2d 139, 140-41 (Tex.App.-Texarkana 1993, writ denied). Accordingly, the court abused its discretion by denying Spencer's continuance requests. We now decide whether this error requires reversal.
Several courts have reversed for violation of Rule 245 without reference to harm. See, e.g., Platt v. Platt, 991 S.W.2d 481, 484 (Tex.App.-Tyler 1999, no pet.); In re Estate of Crenshaw, 982 S.W.2d 568, 571 (Tex.App.-Amarillo 1998, no pet.); Carson v. Hagaman, 824 S.W.2d 267, 269-70 (Tex.App.-Eastland 1992, no writ). The courts seem to have done so because of a perception that providing less notice than required by Rule 245 constitutes a due process violation or because compliance with the rule is "mandatory." See Platt, 991 S.W.2d at 483; Crenshaw, 982 S.W.2d at 571; Carson, 824 S.W.2d at 269-70. At least one court has conducted a harm analysis before reversing for violation of Rule 245. See Bell Helicopter Textron, 863 S.W.2d at 141.
Due process requires that a party receive "reasonable notice" of trial. See Peralta, 485 U.S. at 84, 108 S.Ct. at 899, 99 L.Ed.2d at 81; In re Marriage of Parker, 20 S.W.3d 812, 818 (Tex.App.-Texarkana 2000, no pet.). "Rule 245 provides a notice requirement that goes beyond the requirements of due process." Parker, 20 S.W.3d at 818. We agree with this reasoning and conclude that the fact that a party has received less than the forty-five days' notice required by Rule 245 does not, standing alone, constitute a due process violation. Id. at 818-19.
To obtain reversal on the basis of trial error, a party must establish that the error was "harmful." See Tex.R.App. P. 44.1(a); Texas Dep't of Human Servs. v. White, 817 S.W.2d 62, 63 (Tex.1991); Owens-Corning Fiberglas Corp. v. Malone, 916 S.W.2d 551, 557 (Tex.App.-Houston [1st Dist.] 1996), aff'd, 972 S.W.2d 35 (Tex.1998). A trial error requires reversal (i.e., is "harmful") if it:
(1) probably caused the rendition of an improper judgment; or
(2) probably prevented the appellant from properly presenting the case to the court of appeals.
Tex.R.App. P. 44.1(a); White, 817 S.W.2d at 63.
*616 Spencer's attorneys made their first appearance in her behalf on September 7 when they filed the motion for new trial. CPS provided counsel with a copy of "the Department's file" on September 21. According to Spencer's counsel, "The file contains approximately 1000 pages, completely out of order, which must be organized, categorized and reviewed prior to even being able to depose witnesses." CPS did not dispute this characterization in the hearing on Spencer's first continuance motion.
Spencer's counsel served discovery requests on CPS on September 23. The court heard Spencer's first continuance motion on September 29. Spencer's counsel informed the court in this hearing that he would like to depose some of CPS's witnesses after reviewing CPS's discovery responses. He noted that there would not be adequate time to accomplish this with the October 24 setting.
CPS's counsel responded:
[A]s the court is probably aware, it's my practice to give the respondent's attorney the entire record in exchange for them agreeing not to serve me with discovery. Ms. Maughan was insisting that she get the record immediately, so I just told CPS to give her the record as soon as possible. To answer this discovery, I'm going to just look through the record to answer it. I'm going to get the same disorganized record that they have got. They can look through the record and answer that as well as I canprobably even betterbecause I don't even have the record yet and I'm probably not going to request it for another two weeks. I'm going to have to go through that same record and try to prepare for the case.
As noted above, the court partially granted Spencer's continuance, moving the trial setting one week to October 31.
CPS responded to Spencer's initial discovery requests on October 24. The next day, Spencer noticed three CPS witnesses for depositions on October 30, the day before trial. CPS filed a motion to quash these deposition notices on October 26 on the basis that the depositions were set less than thirty days before trial. See Tex.R. Civ. P. 190.3(b)(1)(A). The court heard CPS's motion to quash and Spencer's third continuance motion the next day. The court granted CPS's motion to quash and denied Spencer's continuance motion, and the parties proceeded to trial four days later.
Spencer argues that she was harmed by the court's error because she did not have sufficient opportunity to conduct the depositions she felt necessary to present her case. CPS responds that the court could have quashed Spencer's deposition notices even if it had given her additional notice of trial because the depositions still would have been set less than thirty days before trial. We note, however, that the court has discretion not to quash a deposition set less than thirty days before trial. See Tex.R. Civ. P. 190.4(a) (court may set its own discovery control plan "tailored to the circumstances of the specific suit"), 190.5 ("court may modify a discovery control plan at any time"), 191.1 (except where expressly prohibited, discovery rules "may be modified in any suit ... by court order for good cause").
Rule of Appellate Procedure 44.1(a)(2) provides that an error in a civil case will require reversal if it "probably prevented the appellant from properly presenting the case to the court of appeals." Tex.R.App. P. 44.1(a)(2). We have previously held that a trial court's improper refusal to permit the defendants in a class-certification case to present evidence "plainly prevented Defendants from presenting their case to us." See Monsanto Co. v. Davis, *617 25 S.W.3d 773, 786 (Tex.App.-Waco 2000, pet. dism'd w.o.j.). We likewise hold that the court's failure to provide the notice required by Rule 245 "plainly prevented [Spencer] from presenting [her] case to us" because it prevented her from developing evidence important to her case. Id. Accordingly, we conclude that Spencer's first issue is meritorious.
Even though this error requires reversal, we will also address two other issues likely to arise on the retrial of this cause. See Edinburg Hosp. Auth. v. Trevino, 941 S.W.2d 76, 81 (Tex. 1997); Indemnity Ins. Co. of N. Am. v. Williams, 129 Tex. 51, 53, 99 S.W.2d 905, 906 (1937); Boone v. LeGalley, 29 S.W.3d 614, 616 (Tex.App.-Waco 2000, no pet.).

EVIDENCE FROM PRIOR REMOVAL
Spencer's fourteenth issue challenges the court's admission of testimony and photographs regarding the condition of her home several years before J.B. was born. She contends that this evidence is irrelevant and unfairly prejudicial. CPS responds that the evidence was admissible to rebut Spencer's testimony and that of a former CPS caseworker.
The decision to admit or exclude evidence rests within the sound discretion of the trial court. See Texas Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex.2000); In re J.O.C., 47 S.W.3d 108, 112 (Tex.App.-Waco 2001, no pet.). A trial court abuses this discretion when it rules on the admissibility of the evidence in an arbitrary or unreasonable manner or without reference to guiding rules or principles. See J.O.C., 47 S.W.3d at 112 (citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985)); accord City of Brownsville v. Alvarado, 897 S.W.2d 750, 754 (Tex.1995).
We note that the condition of Spencer's home several years before J.B.'s birth has no relevance to the issue of whether she knowingly placed or allowed J.B. to remain in dangerous conditions or surroundings.[4]See In re D.T., 34 S.W.3d 625, 632-33 (Tex.App.-Fort Worth 2000, pet. denied) ("the environment of the child must be examined to determine if that is a source of endangerment to the child"); In re B.B., 971 S.W.2d 160, 169 (Tex.App.-Beaumont 1998, pet. denied) (no evidence to support termination on this basis when there was "no evidence in the record of the conditions or surroundings P.B. was in for th[e] few days [he was in his mother's custody before removal]"); see also Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ) ("The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child[is] removed.").
"Rebuttal evidence is evidence given to disprove facts given in evidence by an adverse party." Apresa v. Montfort Ins. Co., 932 S.W.2d 246, 251 (Tex.App.-El Paso 1996, no writ) (emphasis omitted) (quoting Valley Indus., Inc. v. Cook, 767 S.W.2d 458, 462 (Tex.App.-Dallas 1988, writ denied)); accord In re Bledsoe, 41 S.W.3d 807, 813 (Tex.App.-Fort Worth 2001, orig. proceeding). "Rebuttal testimony can be introduced only after the parties have closed the evidence offered in chief. They must then limit their rebuttal to those issues which were placed in conflict by the adverse party's evidence during the case in chief." Greenstein, Logan & Co. v. Burgess Mktg., Inc., 744 S.W.2d *618 170, 179 (Tex.App.-Waco 1987, writ denied) (citation omitted).
CPS called Spencer as its first witness. Spencer testified under questioning by counsel for CPS that CPS removed her four children from another relationship in March 1995 because her home was "filthy nasty" and "not suitable for children to live in."[5] Counsel for CPS pressed Spencer regarding the conditions of the home:
Q: Now, you had disabled the smoke detector in that house; is that correct?
A: No, I did not.
Q: You weren't using it toyou hadn't taken out the battery and used it to burn incense with?
A: No, I did not.
Q: Had anyone done that?
A: No.
Q: So the smoke detector was working fine at that time?
A: To my knowledge, it was.
CPS called Jennifer Tustin during its case-in-chief to testify about the agency's prior involvement with Spencer's children. CPS assigned Tustin to Spencer's case in October 1997 for "family reunification." Tustin testified that, during the first three months of Tustin's involvement, Spencer was doing well in her efforts to comply with the service plan established by CPS.[6] According to Tustin:
Things appeared to disintegrate probably about approximately three months into my case with Kaltina. She had done really well at the beginning. She was passing her inspections, keeping her house clean, she had gotten a job, you know, things were going along well, and then all of a sudden it just, boom, it went bad and just rapidly disintegrated.
Tustin described Spencer's apartment during the first few months of her involvement in the case as follows:
Almost always it was clean or when I would show up, she was in the process of cleaning it. I remember specifically her cleaning behind the stove and doing a lot of things that even I didn't do at home, and I was very impressed with that.
Tustin concluded her testimony on direct examination by stating that she never saw anything that would be hazardous to the children on any of her home visits.
During its rebuttal case, CPS presented the testimony of a Waco police sergeant who was dispatched to Spencer's apartment in March 1995.[7] She found Spencer's children alone in the apartment. The sergeant described the apartment as "very filthy." CPS presented seventeen photographs of the apartment which the court admitted over Spencer's objections. Sixteen of the photographs depict various rooms in the apartment. One depicts a smoke detector with the cover removed and incense inserted, presumably for burning.
After the police sergeant, CPS called caseworker Staci Love who was assigned to Spencer's case in October 1996. Love made a home visit that month and found it to be extremely filthy. The court admitted four photographs taken by Love during the October 1996 visit. Love testified *619 on cross-examination that she noticed a constable serving Spencer with an eviction notice one day when she was driving by Spencer's apartment after the case had been transferred to Tustin and the family reunification unit. She "stopped to see, since [she] had prior history, what was going on." She testified that the house was "in total disarray" on that occasion as well.
The testimony and photographs offered through the police sergeant and caseworker Love do not qualify as rebuttal evidence because CPS offered them to rebut evidence presented during its own case-inchief. See Valley Indus., 767 S.W.2d at 462. Moreover, only a single photograph offered through the police sergeant actually rebuts Spencer's testimony (namely, that her smoke detector had not been altered to burn incense), and none of the photographs or testimony rebuts Tustin's testimony (namely, that Spencer kept a clean apartment from October 1997 to early 1998).[8] Accordingly, we conclude that the court abused its discretion by admitting this evidence. Thus, Spencer's fourteenth issue is meritorious.

EXPERT TESTIMONY
Spencer's fifteenth issue challenges the expert testimony of Dr. James Shinder offered by CPS on the issues of Spencer's parenting abilities and whether termination of her parental rights would be in J.B.'s best interest.[9] Specifically, Spencer contends that CPS failed to demonstrate that a parenting assessment Dr. Shinder conducted and from which he drew his conclusions is based on a reliable methodology.

Pertinent Authorities
Rule of Evidence 702 governs the admissibility of expert testimony. See Tex.R. Evid. 702; Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex.1998); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 554 (Tex.1995). Once the opposing party objects to proffered expert testimony, the proponent of the witness's testimony bears the burden of demonstrating its admissibility. See Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex.2002); Robinson, 923 S.W.2d at 557. To be admissible, the proponent must demonstrate: (1) that the expert is qualified; and (2) that the expert's testimony is relevant and reliable. See Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.2001); Robinson, 923 S.W.2d at 556; see also Kraft, 77 S.W.3d at 807.
These are threshold issues which the trial court determines under Rule of Evidence 104(a) before admitting the testimony. See Tex.R. Evid. 104(a); Gammill, 972 S.W.2d at 718; Robinson, 923 S.W.2d at 556. In this regard, the trial court acts as a "gatekeeper." See Gammill, 972 S.W.2d at 726; Tarrant Reg'l Water Dist. v. Gragg, 43 S.W.3d 609, 618 (Tex.App.-Waco 2001, pet. granted); see also Judge Harvey Brown, Eight Gates for Expert Witnesses, 36 Hous. L.Rev. 743, 744 (1999). We review the court's determination under an abuse-of-discretion standard. See Kraft, 77 S.W.Sd at 807; Helena Chem, Co., 47 S.W.3d at 499; Robinson, *620 923 S.W.2d at 558. We examine the record as a whole when we review a preliminary determination under Rule 104(a). See St. Paul Med, Ctr. v. Cecil, 842 S.W.2d 808, 815 (Tex.App.-Dallas 1992, no writ) (citing Moore v. Polish Power, Inc., 720 S.W.2d 183, 192 (Tex.App.-Dallas 1986, writ ref'd n.r.e.)).
The Supreme Court has identified a nonexclusive list of factors which can be considered in assessing reliability:
(1) the extent to which the theory has been or can be tested;
(2) the extent to which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and/or publication;
(4) the technique's potential rate of error;
(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
(6) the non-judicial uses which have been made of the theory or technique.
See Gammill, 972 S.W.2d at 720 (citing Robinson, 923 S.W.2d at 557); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-95, 113 S.Ct. 2786, 2796-98, 125 L.Ed.2d 469, 482-84 (1993).
By its terms, Rule 702 applies to testimony based on "scientific, technical, or other specialized knowledge." Tex.R. Evid. 702. Various classifications have arisen concerning the types of testimony governed by the rule. Some cases have distinguished between "scientific" and "non-scientific" expert testimony. See, e.g., Gammill, 972 S.W.2d at 724; Nenno v. State, 970 S.W.2d 549, 560 (Tex.Crim.App.1998). Some decisions have used the language of the rule itself by referring to some experts as possessing "specialized knowledge." See, e.g., Kraft, 77 S.W.3d at 807 (quoting Tex.R. Evid. 702). In Nenno, the Court of Criminal Appeals divided "scientific" expertise into two subcategories: "hard" sciences and "soft" sciences. See Nenno, 970 S.W.2d at 560.
In Gammill, the Supreme Court noted a potential difference between expert testimony based on methodology and that based on experience. See Gammill, 972 S.W.2d at 722-27. The Court cited the oft-quoted[10] "beekeeper" analogy to illustrate the distinction between methodological and experiential expert testimony:
[I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have. *621 Gammill, 972 S.W.2d at 724-25 (quoting Berry v. City of Detroit, 25 F.3d 1342, 1349-50 (6th Cir.1994)).
Nevertheless, the Court made clear that expert testimony cannot always be neatly categorized.
That said, it is equally clear that the considerations listed in Daubert and in Robinson for assessing the reliability of scientific evidence cannot always be used with other kinds of expert testimony. To borrow the Berry court's analogy, a beekeeper need not have published his findings that bees take off into the wind in a journal for peer review, or made an elaborate test of his hypotheses. Observations of enough bees in various circumstances to show a pattern would be enough to support his opinion. But there must be some basis for the opinion offered to show its reliability. Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case. A more experienced expert may offer unreliable opinions, and a lesser experienced expert's opinions may have solid footing. The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed.
Gammill, 972 S.W.2d at 726. More recently the Court noted:
In Robinson, we identified six nonexclusive factors to determine whether an expert's testimony is reliable and thus admissible. But in Gammill we recognized that the Robinson factors may not apply to certain testimony. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability.
Helena Chem. Co., 47 S.W.3d at 499 (citations omitted).[11]
From these authorities we conclude that a court should attempt first to apply the Robinson factors to proffered expert testimony. Perhaps only a few of the factors will be useful in a particular case. In other cases, none of the factors will be helpful. In either case, the trial court must exercise its discretion to identify and employ other factors as necessary to assess the reliability of the proffered testimony. See Helena Chem.. Co., 47 S.W.3d at 499; Gammill, 972 S.W.2d at 726; Robinson, 923 S.W.2d at 557.
The reliability of Dr. Shinder's testimony is at issue here. For purposes of Rule 702, reliability includes three components: (1) foundational reliability;[12] (2) methodological reliability;[13] and (3) "connective" *622 reliability.[14]See Brown, 36 Hous. L.Rev. at 747-49 (citing Gammill, 972 S.W.2d at 726-28; Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997); Robinson, 923 S.W.2d at 555-56); see also Helena Chem. Co., 47 S.W.3d at 499. Spencer specifically challenges the reliability of Dr. Shinder's methodology.

The Testimony at Issue
Dr. Shinder is a psychologist with nearly thirty years' experience. He received a masters degree in public health in 1979. His masters research focused on the issues of "abuse and neglect." He holds memberships with the American Psychological Association, the Texas Psychological Association, and several other unidentified professional groups. His practice focuses "almost exclusively [on] the areas of abuse and neglect and various forensic or criminal or criminally-oriented behaviors."
Dr. Shinder conducted a "parenting assessment" of Spencer almost a year before trial. In his own words, his testimony at trial related "primarily or ... exclusively in [his] involvement in providing the parenting assessment" and "to [his] observations and conclusions regarding her parenting capabilities."
Dr. Shinder described his methodology as follows:
Very briefly, a parenting assessment involves a complete review of all existing records and then questioning of the individual in two areas. You're looking at the extent of their knowledge about parenting, as well as what action they have taken in regard to areas where they have knowledge of problems with their own children.
During a hearing outside the presence of the jury, Dr. Shinder provided the following testimony regarding his methodology:
Q: How often have you used this approach in the past?
A: It's frequently used. I did one as recently as last night in the office. It's a very commonly pursued type of an evaluation.
Q: Does this approach generally require a subjective or objective interpretation?
A: It's clearly objective. You're attempting to determine the extent of someone's knowledge. "Are you aware of this information or not," and then you ask them, in fact, have they acted upon that in various ways.
Q: Do you feel another person in your field using your same approach would have gotten fairly similar results to what you received?
A: Yes.
Q: Is your approach or theory generally accepted by the community, the scientific community within which you belong?
A: To the best of my knowledge, yes.

*623 Q: Do you know by what groups or organizations it is generally accepted or relied upon?
A: That's a difficult question. Groups or organizations. It's a standard format that's utilized throughout the field in all areas. Some of the questions that I use I've obtained through a questionnaire that was put out by the American Academy of Pediatrics. There is one area where I use a limited number of questions which I don't know the name of the national group, but it's a dietary management or dietician's group or whatever. I think the major areas of questioning are accepted by most national groups.
Q: Do you know how long this has been accepted?
A: Again some [of] the questions I'm sure have many, many years of acceptance because basically as long as we've accepted the need to refrigerate foods or the need to provide children with immunizations, things of that nature.
The record does not contain a copy of the questionnaire Dr. Shinder used to conduct Spencer's parenting assessment. However, his testimony indicates that he asked questions which touched upon the following topics: goals for the children's future;[15] personal acknowledgment of past child-rearing mistakes;[16] ability to meet the needs of the children;[17] extent of support from relatives and others in childrearing;[18] "parental insight"; "parental energy"; child-rearing practices;[19] ability to handle crises;[20] interpersonal relations with her children;[21] and food preparation awareness.[22]
Dr. Shinder relied on the parenting assessment and Spencer's "extensive range of personal[ity] problems as well as historical data"[23] to conclude that termination of *624 her parental rights would be in J.B.'s best interest.

ANALYSIS
We will examine the methodological reliability of Dr. Shinder's testimony first in light of the Robinson factors. If these factors do not enlighten us in this inquiry, we will then look to other appropriate factors.
1. Extent to Which the Theory Has Been or Can Be Tested
According to Dr. Shinder's testimony, his parenting assessment has never been tested by an independent organization.
[T]here are some things that are such obvious realities that they don't need to be peer reviewed or further researched. The sun will rise tomorrow morning. We don't need to peer review it and research it. It's just a reality. A parenting assessment is almost that concrete when you start asking questions about the care of children.
Thus, this factor may not apply to the parenting assessment.
2. Extent to Which the Technique Relies upon the Subjective Interpretation of the Expert
Dr. Shinder described his parenting assessment as objective in nature. "It's clearly objective. You're attempting to determine the extent of someone's knowledge."
I wouldn't consider it to be subjective because of the realities of parenting. I will present the information to the averageor the jury. The average juror has dealt with just about every similar consideration in raising their own children. I don't think it's subjective. I think it's objective. Now, there are things that are realities that have to be addressed.
Although Dr. Shinder describes the assessment as "clearly objective," his reluctance to make a copy of the questionnaire available for independent review makes his assessment subjective in practice.
3. Whether the Theory Has Been Subjected to Peer Review and/or Publication
Dr. Shinder testified that he acquired some of the questions used in his parenting assessment from a brochure published by the American Academy of Pediatrics. Some of the questions came from an unidentified national dietetic organization. He consulted at least twice with a local pediatrician when he initially developed the parenting assessment. Since that time, he has not sought peer review. According to Dr. Shinder, "To publish would be suicidal because you folks [attorneys] would read every publication and you would use every statement I make against me on the stand, so I can't publish until I retire."
Dr. Shinder named the Academy of American Pediatricians and an unidentified national dietetic organization as sources for many of the questions used in his parenting assessment. However, he did not produce the brochure purportedly published by the pediatrician's organization and he could not even name the dietetic organization. His failure to do so and his reluctance to publish his questionnaire weighs against the reliability of his methodology. See Minnesota Mining & Mfg. Co. v. Atterbury, 978 S.W.2d 183, 200 (Tex.App.-Texarkana 1998, pet. denied) ("this Court cannot do th[e] required task if an expert does not cite to and explain precisely the studies that he relies upon"); America W. Airlines, Inc. v. Tope, 935 S.W.2d 908, 919 (Tex.App.-El Paso 1996, no writ) ("Peer review of [expert]'s method was limited, and she offered no examples of *625 publication of her work"); see also Green v. State, 55 S.W.3d 633, 640 (Tex.App.-Tyler 2001, pet. ref'd) ("Though [expert] testified that there had been books and articles published in the field, he did not name any book, article, or publication of any type").
4. The Technique's Potential Rate of Error
Dr. Shinder proffered no testimony regarding the potential rate of error which might occur from the use of his parenting assessment. He did testify that "another person in [his] field using [his] same approach would have gotten fairly similar results." Again, Dr. Shinder's failure to cite any particular studies or reports supporting this assertion weighs against the reliability of his methodology. Id.
5. Whether the Underlying Theory or Technique Has Been Generally Accepted as Valid by The Relevant Scientific Community
Dr. Shinder testified that "to the best of [his] knowledge" his approach is generally accepted by the scientific community to which he belongs. He could not identify any groups or organizations by which his approach is generally accepted. "That's a difficult question. Groups or organizations. It's a standard format that's utilized throughout the field in all areas."
In a similar vein, Dr. Shinder stated that "[t]here are a number of texts that have been written specific ... to th[e] topic" of "scientific[] confirm[ation] that it's in the best interest of a child to have that child's parental rights terminated [sic]." He did not name any of these scientific texts however.
As with the preceding two factors, Dr. Shinder's inability to produce any specific texts or publications supporting his contention that his parenting assessment is generally accepted in the scientific community weighs against the reliability of his methodology. Id.
6. Non-judicial Uses Which Have Been Made of the Theory or Technique
Dr. Shinder's testimony suggests that he employs his parenting assessment almost exclusively in courtroom settings. "I think [the assessment questions have] been analyzed in court many times.... [I]f one chooses to do the type of work I do, you're in court a great deal." Our research discloses at least six reported cases since 1997 in which CPS offered Dr. Shinder's testimony in a termination case.[24]
The fact that Dr. Shinder employs his parenting assessment almost exclusively in connection with judicial proceedings weighs against the reliability of his methodology.

Summary
Regarding the Robinson factors, CPS proffered only the testimony of Dr. Shinder to establish the reliability of his methodology. Dr. Shinder offered no specific, independent sources to support the reliability of his methodology. See Kraft, 77 S.W.3d at 808 ("Gholson's `bald assurance' that he was using the widely accepted approach was not sufficient to demonstrate that his opinion was reliable."); Gammill, *626 972 S.W.2d at 727 ("The district court was not required, in Joiner's words, to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.") (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508, 519 (1997)); Robinson, 923 S.W.2d at 559 (expert's "selfserving statements that his methodology was generally accepted and reasonably relied upon by other experts in the field are not sufficient to establish the reliability of the technique"). Accordingly, we conclude that the court abused its discretion by admitting Dr. Shinder's testimony. Thus, Spencer's fifteenth issue is meritorious.
We need not address the remainder of Spencer's issues.

STATUTORY DISMISSAL DATE
Sections 263.401 and 263.403 of the Family Code provide that a suit in which CPS has been awarded temporary custody must be dismissed no later than eighteen months after the court's initial order appointing CPS as temporary managing conservator unless the children are returned to their parent or a final order is rendered. See Tex. Fam.Code. Ann. §§ 263.401, 263.403 (Vernon Supp.2002). That time period expired in this case on December 18, 2000. Thus, any retrial of this cause will necessarily occur beyond the statutorily-mandated dismissal date.
The Family Code does not speak to this situation. In 2001, the Legislature added section 263.405 which provides specific timetables and guidelines for an appeal in this type of case. See id. § 263.405 (Vernon Supp.2002). However, section 263.405 is silent regarding any post-appeal timetables. Therefore, we will set a dismissal date to guide the parties on remand. See Tex.R.App. P. 43.6.
It could be argued that the issue of an appropriate post-appeal dismissal date will not be ripe for our review until such time as the trial court dismisses this cause under section 263.401 or renders an "untimely" final order. However, waiting until such time creates a very real potential that J.B. will become the subject of at least two future appellate proceedings: one addressing the propriety of the court acting beyond the statutory dismissal date; see, e.g., In re Ruiz, 16 S.W.3d 921 (Tex.App.-Waco 2000, orig. proceeding [mand. denied]); and a second addressing the merits of the suit. This would run counter to the very purpose of section 263.401 which is "to carry out the recommendation of the Governor's Committee [to Promote Adoption] that parental rights be terminated or families reunified within twelve months." Ruiz, 16 S.W.3d at 926 (quoting In re Bishop, 8 S.W.3d 412, 417 (Tex.App.-Waco 1999, orig. proceeding [mand. denied])).[25]
Accordingly, we set the new dismissal date at 180 days after the issuance of our mandate in this cause. The trial court may not extend this deadline. "If the [trial] court ... does not render a final order or dismiss the suit on or before the required date for dismissal ..., the court shall dismiss the suit." Tex. Fam.Code. Ann. § 263.401(c).
We reverse the judgment and remand this cause to the trial court for further proceedings consistent with this opinion.
Justice TOM GRAY dissenting. *627 TOM GRAY, Justice, dissenting.
The majority has decided three issues of significance to the parties in this case and granted relief beyond that requested. Of the three issues decided, only two have general applicability to the jurisprudence of this State. Those two issues are: 1) the interpretation of Rule 245 of the Texas Rules of Civil Procedure; and 2) the admission of expert testimony under Rule 702 of the Texas Rules of Evidence. The issue regarding Rule 245 is the dispositive issue upon which the case is reversed and will probably affect only a small number of cases in the future.
But the issue regarding the admission of expert testimony is far more important to the jurisprudence of the State because it will affect virtually all cases involving the admission of expert testimony, particularly those cases that involve expert testimony based on experience and training rather than testimony based on applying the scientific method. For this reason I will not address the issues in the same order they are addressed in the majority opinion, rather I will address them in the order of their importance.
The third issue of significance to the parties relates to the admission of evidence peculiar to this case so I will only address it briefly. I will then comment upon two other issues: the relief granted by the majority beyond that requested by the parties, and the majority's failure to apply its own dispositive precedent regarding broad form submission of special issues in termination-of-parent-child-relationship cases, rather than avoiding a controversial interpretation of Rule 245.

EXPERT TESTIMONY
The majority has chosen to address the admission of expert testimony from Dr. Shinder because the issue will likely occur on remand. Not only will this issue likely occur on remand in this case, the issue is pertinent to every case in which expert testimony is admitted. Unlike most evidentiary issues, the admission of expert testimony has been the subject of much debate in judicial opinions and legal publications. Considering that it is an evidentiary issue, the admission of expert testimony has been the subject of an inordinate number of United States Supreme Court, Texas Supreme Court, and Texas Court of Criminal Appeals opinions in recent years. Hundreds of lower courts have also addressed the issue.
When this mass volume of cases is reviewed, three generally accepted concepts emerge. First, Rule 702 regarding the admission of expert testimony applies to all scientific evidence, technical evidence, or evidence regarding areas of specialized knowledge sought to be introduced before the fact finder. Second, because the issue is related to the admission of evidence, the trial court is given broad discretion in determining admission of expert testimony. Third, the trial court, upon a proper objection by the opponent, must determine, as a preliminary matter, the reliability of the expert testimony tendered for admission.
But the courts have not been able to reach a consensus on three concepts at issue in this case:
(1) How is the tendered expert testimony to be tested for reliability?
(a) Is the test, and thus the proof, different for "hard" sciences versus "soft" sciences?
(b) Is the type or method of proof required different for "novel" versus established fields or applications?;
(2) How much discretion does the trial court have to select the method to be used for testing the reliability of the tendered expert testimony?; and

*628 (3) What is the appellate court's standard of review for the trial court's selection of a method to test the reliability of the tendered expert testimony?
HOW TO TEST RELIABILITY?
Many of the cases regarding admission of expert testimony have involved what test the trial court should use to determine the admissibility of expert testimony. It is the majority's selection of the test for admissibility with which I have my principle disagreement. The natural place to start regarding the test for admissibility of expert testimony is with the language of the Rule. Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
Tex.R. Evid. 702.
The Texas Supreme Court, in Helena, characterized the test of admissibility of expert testimony as a two part test. Helena Chemical Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.2001). The Court stated: "A two-part test governs whether expert testimony is admissible; (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation ... [t]he trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements." Id. (Internal citations omitted).
Thus, Helena breaks the rule into two discreet parts: (1) qualification of the expert; and (2) the relevance and reliability of the evidence. The second part of the test can be divided into at least two parts: (1) the reliability of the evidence; and (2) the relevance of the evidence.
Earlier, in Robinson, the Court characterized the rule as containing three requirements. The Court stated: "Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; and (2) the proposed testimony must be `scientific ... knowledge'; and (3) the testimony must `assist the trier of fact to understand the evidence or to determine a fact in issue.'" E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.1995). The Court effectively divided the third requirement of the Rule into two parts by stating: "In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable." Id. Thus, the Court made the same distinction in Robinson regarding the "third" requirement of the Rule which it later expressly made the "second" part of the test described in Helena; that the expert testimony must be both reliable and relevant.
Obviously the Supreme Court in Helena did not eliminate from the Rule the requirement expressed in Robinson that the testimony must be "scientific ... knowledge" to be considered for admission under Rule 702. Thus, a full description of the hurdles that a proponent must overcome to get expert evidence before the fact finder could be summarized as follows:
1. The witness must be qualified as an expert to testify about the subject by knowledge, skill, experience, training, or education;
2. The testimony must relate to scientific, technical, or other specialized knowledge;
3. The testimony must be reliable; and
4. The testimony must be relevant, in essence it must assist the trier of fact to understand the evidence or to determine a fact in issue.
*629 I note that relevance in this context, under Rule 702, may actually be broader than under Rule 401 because it is not limited to evidence "... having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. Rule 702 also allows the admission of evidence that does nothing more than assist the fact finder to understand other evidence. At the very least, we know that "relevance" under Rule 702 incorporates traditional relevancy analysis under Rules 401 and 402. E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.1995); see Tex.R. Evid. 401, 402, 702.
But it is the third element, the reliability of the tendered expert testimony, that has generated the real debate and is the focus of this dissenting opinion. In particular, how is the trial court, standing at the gate between the world outside the courtroom and the record of evidence upon which the fact finder can properly base its decision, to determine the reliability of expert testimony?
In Robinson, the Texas Supreme Court gave us a non-exclusive list of six factors by which a trial court is to review the reliability of scientific evidence. Robinson, 923 S.W.2d 549 (Tex.1995). Later, in Nenno, the Texas Court of Criminal Appeals gave us a framework by which to test the reliability of "fields of study aside from the hard sciences, such as social sciences or fields that are based primarily upon experience and training as opposed to the scientific method." Nenno v. State, 970 S.W.2d 549, 561 (Tex.Crim.App.1998). Then, in Gammill, the Texas Supreme Court noted that the considerations listed in Daubert and Robinson for assessing the reliability of scientific evidence cannot always be used with other types of expert testimony. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 722-28 (Tex.1998); see Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex.1995).
In its determination of what test to use, the majority correctly observes that "the Supreme Court noted a potential difference between expert testimony based on methodology and that based on experience." Majority opinion at page 17, citing Gammill, 972 S.W.2d at 722-27. And Gammill teaches us that when the Robinson factors do not fit the particular expert testimony, the trial court must still determine the reliability of these other types of expert testimony, those not based on scientific methodology, and thus, must also determine how to assess the reliability thereof. Gammill, 972 S.W.2d at 726.
CAN WE LOOK BEYOND ROBINSON FOR AN APPROPRIATE TEST?
The majority, in contrast to the teaching in Gammill, decides to apply only the Robinson factors for evaluating the reliability of the evidence instead of applying a more appropriate analysis tailored to this particular expert testimony. Even though the Texas Supreme Court has not expressly determined what factors may be considered when evaluating the admissibility of testimony from a social scientist, whose testimony is sometimes referred to as soft science evidence, it has expressly stated that experience alone may provide a sufficient basis for an expert's testimony in some cases. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex.1998). And it has also expressly stated that the factors used in Robinson for testing the reliability of scientific evidence cannot always be used to test the reliability of other kinds of expert testimony. Id. In essence, Robinson may not be applicable *630 to "other" expert testimony, that which was not derived through the scientific method. Additionally, the Court of Criminal Appeals, in Nenno, expressly identified some factors for the trial court to use when determining the reliability of social science evidence. Nenno v. State, 970 S.W.2d 549, 561 (Tex.Crim.App.1998). So what is the trial court to do when faced with the need to test the reliability of "other" expert testimony in a civil case?
This leads us to the question: Could the trial court properly use factors other than those set out in Robinson, for example those from Nenno, in this civil proceeding? Id; see E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.1995). Without explanation, the majority limits its analysis to the independent application of the Robinson factors. I believe this independent application is wrong for two reasons. First, I believe it is error to consider only the Robinson factors in evaluating this particular expert testimony. Not only may the trial court use the factors from Nenno, in essence factors other than those applied in Robinson, but the trial court must tailor the factors it uses in a particular case to meet the ultimate objective: to determine the reliability of the particular expert testimony being considered for admission before the fact finder. Second, I believe the majority has erroneously conducted a de novo application of the Robinson factors to the evidence. After making its own evaluation of the factors and having determined that the evidence does not meet the Robinson test, rather than reviewing the trial court's evaluation, the majority improperly concludes that the trial court abused its discretion in admitting the testimony.
HARMONIZING CIVIL AND CRIMINAL RULE 702 ANALYSIS
As indicated above, the majority errs in considering only the Robinson factors. In Robinson, the Texas Supreme Court based its holding construing Rule 702 of the Civil Rules of Evidence on the reasoning of Kelly, a Court of Criminal Appeals case that construed Rule 702 of the Criminal Rules of Evidence. E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex.1995); Kelly v. State, 824 S.W.2d 568 (Tex.Crim.App.1992); Tex.R. Civ. Evid. 702; Tex.R.Crim. Evid. 702; see Musgrove v. State, 82 S.W.3d 34, 38 (Tex.App.-San Antonio 2002, no pet.) (effective March 1, 1998, the Texas Rules of Evidence replaced the former Texas Rules of Civil Evidence and the former Texas Rules of Criminal Evidence). By adopting the analysis of Kelly in Robinson, the Texas Supreme Court provides precedent that analytical reasoning used in criminal cases can and should be used in civil cases when appropriate. Because the Civil Rules of Evidence and the Criminal Rules of Evidence have been combined into the Texas Rules of Evidence since the decisions of Kelly and Robinson, even greater weight should be given to the argument that this is an appropriate case in which the interpretation of Rule 702 should be harmonized. Tex.R. Evid. 702; see Clewis v. State, 922 S.W.2d 126 (Tex.Crim.App.1996).
One case which specifically discusses the general goal of harmonizing the interpretation of civil and criminal rules is Clewis, in which the Court of Criminal Appeals purported to harmonize the criminal and civil jurisprudence of Texas regarding appellate review for factual sufficiency. Clewis v. State, 922 S.W.2d 126 (Tex.Crim.App.1996); Johnson v. State, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). In Clewis, the Court stated: "[t]his holding harmonizes the criminal and civil jurisprudence of this State with regard to appellate review of questions of factual sufficiency." Clewis, 922 S.W.2d at 129.
*631 In several cases, a majority of this court used this same rationale, harmonization of the interpretation of civil and criminal rules, to extend criminal procedural rules to civil termination cases. For example, we held in A.P. that review of unpreserved sufficiency-of-the-evidence complaints about the two core issues in termination cases is appropriate. In the Interest of A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.). The majority later explained their reasoning for this holding by stating in B.L.D. "we also recognize that when appropriate, harmonization of civil and criminal jurisprudence is one of our goals. Therefore, when appropriate, we look to criminal law to determine similar or corresponding issues." In the Interest of B.L.D., 56 S.W.3d 203, 211 (Tex.App.-Waco 2001, pet. granted).
In J.F.C., the majority held that we will review, as we do in criminal cases, unpreserved complaints about charge errors that pertain to the two core issues of termination cases. In the Interest of J.F.C., 57 S.W.3d 66 (Tex.App.-Waco 2001, pet. granted). And in B.L.D., the majority held that the statutory right to counsel means the effective assistance of counsel as it does in criminal cases. B.L.D., 56 S.W.3d at 212.
Based on these holdings, I do not understand why the majority refuses to consider that the trial court could have applied the Nenno factors when evaluating the reliability of social science evidence in a civil termination case. While I believe we have erred in making criminal procedural rules apply to civil termination proceedings, In the Interest of J.F.C., 57 S.W.3d 66 (Tex.App.-Waco 2001, pet. granted) (Gray, J., dissenting) and In the Interest of B.L.D., 56 S.W.3d 203, 211 (Tex.App.-Waco 2001, pet. granted) (Gray, J., dissenting), I generally agree civil and criminal law should be harmonized when appropriate. In particular, there needs to be consistency in the interpretation of this evidentiary rule which now applies in both civil and criminal trials regarding the admissibility of evidence based on the reliability of expert testimony as determined by the trial court acting in its gatekeeper function.
Based on the Texas Supreme Court's application of Kelly in deciding Robinson, and additional cases decided by this court and the Court of Criminal Appeals, I think we should at least use the Nenno factors as a persuasive framework for analysis of social science evidence until the Texas Supreme Court gives us other guidance. Nenno v. State, 970 S.W.2d 549 (Tex.Crim.App.1998); E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex.1995); Kelly v. State, 824 S.W.2d 568 (Tex.Crim.App.1992). Thus, at a minimum, I would evaluate the reliability of the testimony of Dr. Shinder, a psychologist, according to the analysis the Court of Criminal Appeals applied in Nenno. Nenno, 970 S.W.2d at 561. I note that the appellant cites Nenno, thus acknowledging its applicability to this case.
THE NENNO ANALYSIS
To apply the Nenno analysis to this case, we must first understand how the Nenno analysis is applied in general. In Nenno, the Court of Criminal Appeals explained that the methods of validating hard science, "such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences." Id. Without eliminating the reliability requirement of Kelly, the Court then went on to provide the appropriate questions when addressing fields of study such as the social sciences, or fields that are based on experience and training as opposed to the scientific method. Nenno v. State, 970 S.W.2d 549, 561 (Tex.Crim.App.1998). These questions *632 are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. Id.
This court used the analysis for reliability of social science evidence from Nenno to affirm the trial court's admission of testimony by a "registered play therapist" in Campos. Campos v. State, 977 S.W.2d 458, 463-4 (Tex.App.-Waco 1998, no pet.). Campos involved a determination of whether the methodology used by a therapist was a proper basis for expert testimony in a trial on the charge of aggravated sexual assault. We reviewed the methodology used by the therapist, regarding "play therapy," and stated: "her office is filled with specific toys and activities which are chosen specifically to encourage children to express their feelings." Id, at 464. In developing her expert opinion, the therapist applied her observations of the child to what she had learned about the behavior of abused children through her studies. Id. at 463-4. This court found that the trial "court acted within its discretion in finding this testimony relevant, reliable, and helpful to the jury." Id. at 464.
Application of Nenno
We now consider the actual application of the Nenno analysis to Dr. Shinder's testimony in this case. When Dr. Shinder's testimony is reviewed under this analysis, it is clear the evidence was reliable.
Legitimate Field of Inquiry?
From Dr. Shinder's testimony it is clear that the two fields of expertise under consideration are psychology and public health. He testified that he earned a Ph.D. in psychology in 1973 and his masters degree in public health, focusing on issues of abuse and neglect, in 1979. He has practiced in these fields, focusing on issues of abuse and neglect, since that time.
It is not clear that Spencer's objection challenged whether these were legitimate fields of expertise. I believe it is foolish to even consider that psychology and public health are not legitimate fields of expertise. Thus, the trial court should be able to make this determination without evidence, in essence take judicial notice that these are legitimate fields of expertise. See Hartman v. State, 946 S.W.2d 60, 63 (Tex.Crim.App.1997) (Keller, J., concurring and dissenting).
But if we are required to examine the record there is adequate evidence to support the determination that these are legitimate fields for expert testimony. The State did not attempt to present any testimony directly related to a determination of whether these are "legitimate" fields of expertise. The evidence does support the fact, however, that there are universities from which Dr. Shinder has received advanced degrees in these particular fields. This is circumstantial evidence upon which the trial court could properly conclude that psychology and public health are legitimate fields of specialized knowledge. Accordingly, the trial court would not have abused its discretion if it determined the answer to the first question in the Nenno analysis, whether the field of expertise is a legitimate one, should be answered in the affirmative.
Scope of Testimony within the Field?
Dr. Shinder testified that his assessment of parental abilities was based on an analysis of the parent's objective knowledge in the area of parenting, and an evaluation of whether the parent has acted appropriately on the basis of that knowledge in regard to their children. Dr. Shinder used a questionnaire he developed to assist him in *633 evaluating the parent's objective knowledge, which in turn, assisted him in developing his expert opinion regarding the best interest of J.B. The questions covered a wide range of matters such as food storage, which indicates a parent's ability to evaluate how foods should be safely handled, and how many hours of sleep children generally need each night. These are examples of the questions Dr. Shinder referred to as the objective part of his test.
Dr. Shinder then utilized the answers to these types of questions in conjunction with other information obtained from his review of Spencer's psychological counseling file and his personal interviews of Spencer on a broad range of topics to develop his opinion regarding the best interest of J.B. The other topics on which Dr. Shinder questioned Spencer included how Spencer coped with emergencies, how she reacted to perceived medical needs of the children, and what Spencer anticipated for the future of her children.
As a psychologist with a masters degree in public health and years of experience focusing on abuse and neglect, the analysis performed by Dr. Shinder is within the scope of the fields of expertise under review. Thus, the trial court would not have abused its discretion if it determined the answer to the second question in the Nenno analysis, whether the subject matter of the expert's testimony is within the scope of that field, should also be answered in the affirmative.
Expertise Properly Applied?
Dr. Shinder used established techniques of psychology in interviewing and data gathering, in addition to his training and experience, to assist him in forming and expressing an opinion concerning Spencer's parenting abilities, and in particular, the best interest of J.B. Dr. Shinder conducted a psychological evaluation of Spencer in 1989 when Spencer was still a juvenile, long before this case was filed. He completed the parenting assessment of Spencer less than a year before trial of this case began. Spencer went to one parenting class with Dr. Shinder before she quit attending. Throughout the years, from the time she was a juvenile through her adulthood and parenthood, Spencer has participated in counseling at Dr. Shinder's office. Dr. Shinder properly relied upon and utilized principles involved in the fields of psychology and public health in forming his opinion of Spencer's parenting abilities and, more particularly as applicable to this case, in determining his opinion regarding the best interest of J.B. Therefore, the trial court would not have abused its discretion if it determined the answer to the final question in the Nenno analysis, whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field, should also be answered in the affirmative.
Conclusion Using the Nenno Analysis
A review of the trial court's decision using this analysis for social science evidence (soft science), instead of scientific evidence (hard science), shows the trial court did not abuse its discretion when it determined Dr. Shinder's testimony was admissible because it was reliable and thus helpful to the jury in making its determination whether to terminate the parent child relationship between Spencer and J.B. There is no reasonable distinction between the techniques used by Dr. Shinder to develop his opinion concerning the parent-child relationship between Spencer and J.B. and the techniques used by the play therapist this court approved in Campos to develop her opinion concerning whether a child had been sexually abused. Campos v. State, 977 S.W.2d 458 (Tex.App.-Waco 1998, no pet.). *634 CRITICISM OF THE NENNO ANALYSIS
The distinction that Nenno makes for differentiating between the test for admitting expert testimony regarding hard and soft sciences has not been without its critics. The United States Supreme Court, interpreting the federal counterpart to Rule 702, has determined that the distinction between hard and soft science is too difficult to apply in practice. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, (1999). As the Court explained: "It would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between `scientific' knowledge and `technical' or `other specialized' knowledge. There is no clear line that divides the one from the others." Id. at 148, 119 S.Ct. 1167. The Court determined that the test for reliability cannot be stated with certainty and the trial court must therefore be given wide flexibility in determining what test is appropriate for the particular testimony being offered. The Court noted that the trial court has wide discretion to decide what test is appropriate when the opponent challenges the admissibility of expert testimony. As the Court stated:
The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue....We do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match.
Id. at 150-51, 119 S.Ct. 1167.
The First Court of Appeals has expressly applied Nenno to a civil case. Coastal Tankships, U.S.A., Inc., v. Anderson, 87 S.W.3d 591 (Houston [1st Dist.] 2002, no pet. h.). The problem with its application, as noted by Justice Brister in his concurring opinion, is that the facts were a perfect fit for the application of the Robinson/Havner analysis to scientific evidence of causation. There was no legitimate reason to explain the majority's departure from a straight forward application of Robinson. Neither Kumho nor Nenno can be used as an excuse to abandon established techniques which allow scientific evidence to be tested for reliability in a consistent manner. But, as Gammill teaches us, the trial court must determine the reliability of all expert testimony, and if the Robinson test does not fit the evidence, select another means to test it. This does not mean the trial court can keep selecting methods until a method that necessarily results in admission, or exclusion, is found. The nature of the evidence, rather than the result, should determine the appropriate test.
The majority in this case has refused to apply anything other than the Robinson factors. On the other extreme, a majority of the First Court of Appeals has abandoned Robinson even for scientific evidence of causation. I believe the appropriate answer is somewhere between the extremes represented by these two cases.
I would go beyond the Court of Criminal Appeals' analysis in Nenno which was applied only to the "soft sciences" and join the United States Supreme Court in its analysis that there is no litany of questions that can be asked of every expert to determine if the testimony tendered is reliable. The classification of "hard" versus "soft" *635 sciences may facilitate some differentiation, but in the final analysis I believe that distinction is just another problem that the trial courts and litigants will have trouble applying in practice. With only minor modifications, the Nenno analysis is actually comprehensive enough that it could provide the framework for considering the admissibility of all expert testimony, not just "soft science." While the factors in Robinson, which were the only factors considered by the majority in this case, should normally be applied to scientific evidence, see Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 158-59, 119 S.Ct. 1167, 1179, 143 L.Ed.2d 238, 256-57 (1999) (Scalia, J., concurring), these factors are ill suited to a psychologist rendering an opinion about the best interest of a child. Accordingly, I believe the majority errs by limiting its analysis of the reliability of Dr. Shinder's testimony to consideration of the Robinson factors and no others.
TRIAL COURT DISCRETION AND OUR STANDARD OF REVIEW
We now turn our attention to the second reason why the majority's de novo determination of the Robinson factors is error. As I understand the majority's analysis, they have determined that Dr. Shinder's opinion based upon his "parenting assessment" cannot be admitted into evidence during the trial of this case on remand. I believe the majority has erred in two separate, but related, ways. Foremost, is that the majority failed to determine and review the method that the trial court used to determine the reliability of the testimony. Further, by choosing to conduct its own de novo application of only the Robinson factors, and determining the evidence did not meet them, the majority did not review the trial court's method of determining the reliability of the testimony under the proper standard of review: abuse of discretion.
In essence, the majority failed to review the trial court's method of determining reliability under an abuse of discretion standard. By this analysis, the majority has deprived the proponent of the evidence the opportunity to establish the reliability of the tendered testimony on remand. This is wrong.
For the reasons explained below, we should not prevent the State from establishing the reliability of the testimony on remand with additional or other testimony which the trial court finds to be a satisfactory method of determining the reliability of the expert testimony.
In being critical of the majority's de novo application I am not ignoring Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706 (Tex.1997). In Havner, the issue was whether there was legally sufficient evidence of causation. Thus, the Texas Supreme Court reviewed the entire record to determine if there was any competent evidence of causation. The Court held that none of the evidence the trial court had admitted was reliable testimony of causation. Therefore, no evidence supported the jury's determination that the drug sold by Merrell Dow was the cause of the plaintiff's injury. The result was to reverse and render.
Havner does not represent a de novo selection and application of a particular test for admissibility of expert testimony as has been conducted by the majority in this case. In this case, I am questioning the propriety of the reviewing court deciding what test it will apply, applying the test to the record, and deciding based upon that record, not only that the trial court abused its discretion in admitting the evidence, but also determining that there is no additional evidence that could establish reliability on remand, thus barring the introduction of the evidence upon retrial of the case. While the test for reliability is *636 the same, the result of our analysis for admissibility should be somewhat different when we address the issue under a legal sufficiency analysis, which depends upon the procedural posture in which the issue is presented. See Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 714 (Tex.1997).
When, as in this case, we are reviewing the issue of admissibility, as the Supreme Court noted in Kumho, the trial court must be given the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether that expert's relevant testimony is reliable. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's method is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "just determination" of proceedings. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152-53, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1993).
This is one of the cases in which it may be entirely appropriate for the trial court to avoid a lengthy reliability proceeding on at least some of the Nenno factors. In this case, I do not think that it is inappropriate for us to make the observation that the 19th District Court in McLennan County handles virtually all the domestic relations, juvenile, and termination proceedings in this County. Further, this particular expert has appeared in the 19th District Court many times. Must the trial court conduct the same level of Daubert/Robinson/Kumho hearing in every case in which this expert appears on these subjects? Surely not. See Hartman v. State, 946 S.W.2d 60, 63 (Tex.Crim.App.1997) (Keller, J., concurring and dissenting). This is not to say that every litigant is not entitled to challenge the particular testimony of Dr. Shinder, but to require the trial court to go through the same extensive Daubert/Robinson/Kumho analysis every time that he takes the stand to testify in one of these types of cases seems to scream of judicial inefficiency.
Let me make it clear that I am not advocating a return to the Frye test in which only novel expert testimony is tested for reliability. Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923). But there should be some sliding scale of the type and level of proof required based upon the particular expertise involved. What concerns me is the cost to the litigants and the consumption of judicial resources, taxpayer resources, if in every case the underlying basis of commonly recognized fields of expertise must be proven to establish the reliability of expert testimony. In every case involving the use of radar to determine speed must the reliability of the science of radar be established? Must every case involving identity through DNA or blood testing separately establish the reliability of those fields of expertise? The trial court must be accorded some discretion to determine when a body of knowledge has become so well established that judicial notice or a summary reliability hearing will be acceptable and extensive proof need not be presented, in essence repeated, in every case in which that type evidence is tendered.
It should be sufficient for Dr. Shinder to briefly testify in each case regarding his training and experience, the manner in which this expertise was used to form his opinion in the case at hand, and, assuming *637 the trial court finds the evidence reliable, for the trial court to state upon the record the court's prior experience with Dr. Shinder and summarize the basis of its conclusion regarding the reasons it finds the testimony to be reliable. Of course, if the opponent insist upon an expanded hearing to develop why the expert testimony is unreliable in a particular case, the opponent would certainly be entitled to develop that record and expand upon why the prior experience of the court with Dr. Shinder is not applicable to the testimony tendered in a particular case. This will provide us an adequate record to review the trial court's determination of the reliability of the tendered testimony without unnecessarily consuming the resources of the court and parties.
Additionally, because under Rule 702 the proponent of the evidence has the burden to prove admissibility, we should require very specific objections to attack the basis of expert testimony. Tex.R. Evid. 702. General objections that the tendered testimony does not meet the Daubert/Robinson /702 test should be rejected. Even the adequacy of an objection that the expert testimony is not sufficiently reliable should be questioned because there are multiple elements and ways to test reliability. For example, if the trial court is using Nenno, is the party objecting that the field is not legitimate, the testimony is outside the scope of the field, or that the testimony does not properly rely upon or utilize the principles of the field? The objection should be sufficient to inform the trial court and the proponent of the evidence of the alleged defect in the foundation for the admission of expert testimony.
But regardless of what type or method of proof is required, and what objection is sufficient, our review of the trial court's selection of the method by which it will determine the reliability of the tendered testimony should not be based on the determination of factors we would have used. Instead, we are required to review the method and factors used by the trial court for an abuse of discretion. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1993). If the record is not clear what analysis, method and factors, the trial court used, the trial court's decision should only be overturned if there is no theory under which the evidence could properly be admitted. The majority erred when it selected and then applied only the Robinson analysis. To say it another way, the majority failed to review the trial court's selection of test-for-reliability under the abuse of discretion standard.
LABELING AN EXPERT'S PROCESS OF FORMING AN OPINION
Dr. Shinder related the results of his observations and interviews performed in accordance with his training in psychology and the mental health fields, and used this to explain why it is in the best interest of J.B. to terminate the parent-child relationship with Spencer. This is exactly the type testimony that is helpful to the fact finder on several of the Holley factors used to evaluate the best interest of the child. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). In his expert testimony, Dr. Shinder used the term "parenting assessment" as a label for part of his analysis leading up to his opinion regarding the best interest of J.B. The use of the label, "parenting assessment," seems to have caused the majority undue concern. An expert who chooses to label their particular method or process of forming their expert opinion does not create a new field, or even a novel application in an existing field. We must review what the expert's process was, not the fact that it was labeled.
*638 One final thought on this issue. It is noteworthy that Dr. Shinder's parenting assessment, based on his expertise in psychology and public health, is comparable to the hydrologist work in Gragg, which we expressly approved. Tarrant Regional Water District v. Gragg, 43 S.W.3d 609, 618 (Tex.App.-Waco 2001, pet. granted). The hydrologists in Gragg drew from their expertise and training and utilized information from their specialized field to create a hydrological model used in litigation. They called it "X-FOR." "The model they created used techniques and performed studies in a manner accepted and customary in the [hydrology] industry. The model merely helped with their calculations ..." Tarrant Regional Water District v. Gragg, 43 S.W.3d 609, 617 (Tex.App.-Waco 2001, pet. granted). Because the model was named and was used in litigation did not make it unreliable. Just as the hydrologists made a model using techniques accepted by the industry and called it X-FOR, Dr. Shinder created an analysis using techniques accepted by and customary in the fields of psychology and public health and called it a parenting assessment.

CONCLUSION REGARDING THE ADMISSION OF EXPERT TESTIMONY
Based on the foregoing, I would hold that the trial court did not err in performing its gatekeeper function when it allowed Dr. Shinder to give his opinion regarding the best interest of J.B.

RULE 245
We now must turn our attention to the holding on which the majority reverses the trial court's judgment, a perceived violation of Rule 245. The majority disregards the plain meaning of the words used in Rule 245 and succumbs to the invitation of an able advocate who is allowed to misdirect the focus to another part of the Rule. We should not do violence to the plain wording of this Rule. The Rule provides for 45 days notice of only the first setting of a contested trial. Tex.R. Civ. P. 245. For the second and subsequent settings, 45 days notice is not required. O'Connell v. O'Connell, 843 S.W.2d 212, 215 (Tex.App.-Texarkana 1992, no writ); see also Osborn v. Osborn, 961 S.W.2d 408, 411 (Tex.App.-Houston [1st Dist.] 1997, writ denied).
The misdirection relates to what is a first setting versus a second setting for trial and how much notice is required for a second setting. The Rule does not specify any particular length of notice for a second trial setting, accordingly, notice which comports with due process, "any reasonable notice," is adequate for a second setting. The relevant portion of the Rule is as follows:
The Court may set contested cases on written request of any party, or on the court's own motion, with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties; provided, however, that when a case previously has been set for trial, the Court may reset said contested case to a later date on any reasonable notice to the parties or by agreement of the parties....
Tex.R. Civ. P. 245.
There has been virtually no discussion in published cases of what the 45 day notice requirement means in the context of a second trial setting. But there has been much discussion with regard to its meaning for a first trial setting. This is probably because of the wording of the Rule. As one court has expressed it; "by the clear language of rule 245, the forty-five day notice applies only to the first setting of the trial." State Farm Fire and Cas. Co. *639 v. Price, 845 S.W.2d 427, 431 (Tex.App.-Amarillo 1992, writ dism'd by agr.).
Prior to the current version of the Rule, only 10 days notice of the first trial setting was required. The comments to the Rules and the cases acknowledge that the purpose of the amendment was to harmonize the Rule regarding trial settings with Rule 216 which specifies the proper procedure to obtain a jury trial. See Higginbotham v. Collateral Protection, Inc., 859 S.W.2d 487, 492 (Tex.App.-Houston [1st Dist.] 1993, writ denied); Simpson v. Stem, 822 S.W.2d 323, 324 (Tex.App.-Waco 1992, orig. proceeding); Tex.R. Civ. P. 245, comment; Tex.R. Civ. P. 216. Rule 216 requires a jury demand be made, and the jury fee be paid, more than 30 days before the setting on the non-jury docket. Tex.R. Civ. P. 216. Because the previous version of Rule 245 required only 10 days notice of a trial setting, a trial could be set at a time when it was too late to exercise the right to trial by a jury. To prevent parties from losing the right to trial by a jury, the Rule was amended to require 45 days notice of a first setting. The purpose of the rule change is not an issue in this case. Spencer did not lose her right to a jury trial. Spencer had a jury trial.
The misdirection which the majority follows is very subtle. It begins with the wording of Spencer's issue. The issue focuses on getting 45 days notice of a trial setting rather than which setting the notice is for. The issue is worded: "The trial court erred by requiring appellant to proceed to trial with less than 45 days notice as required by Tex.R. Civ. Pro. 245." The issue does not mention that it is only the first trial setting for which 45 days notice is required, and that the setting about which complaint is made was the second setting.
The relevant question is: What is a "first setting" for trial? Can it mean, as the majority holds, that there is no "first setting" until the litigants are provided at least one notice of trial of not less than 45 days? That is certainly not how the Rule is written. See O'Connell v. O'Connell, 843 S.W.2d 212, 215 (Tex.App.-Texarkana 1992, no writ). Based upon the express language of the rule, if for any reason the trial is not held on the first setting, the length of notice that had been provided for the first setting is immaterial when considering the sufficiency of the notice of the second setting. The only issue regarding the sufficiency of the notice for the second setting is whether the notice meets minimum due process. Id.
The errant focus on having at least one notice of 45 days for a trial setting is the result of not properly analyzing what constitutes a first setting. The majority has held that if an order comes from the trial court of a first setting that provides less than 45 days notice, the setting is "ineffectual." We will return in a moment to the term "ineffectual," but will focus for now on the effect of that holding.
The effect of what the majority has held is that the trial court's order noticing the trial setting on October 23 was no trial setting at all. If the setting is the equivalent of no setting at all, as the majority has held, the litigants may not need to do anything to avoid the consequence of the trial court's order which sets a case with less than 45 days notice. It is as if a first setting without at least 45 days notice is a nullity because it is not authorized by Rule 245. But we know just because the trial court has done something not authorized by the Rules, does not make the trial court's act a nullity. Ex Parte Seidel, 39 S.W.3d 221, 224 (Tex.Crim.App.2001). The potential ramifications of any other holding could be profound. See Id. By extension of the holding that the setting was "ineffectual," does it mean that the *640 trial never occurred? Does it mean that the trial occurred without any notice, in violation of one of the most fundamental tenants of due process? Of course not.
We now return to the term that has caused the problem in construing Rule 245; "ineffectual." Tex.R. Civ. P. 245. We are now the third court to use the term "ineffectual" in the context of construing Rule 245 without defining what the term means. It was first used by the Texarkana Court of Appeals in Bell in 1993. Bell Helicopter Textron, Inc. v. Abbott, 863 S.W.2d 139 (Tex.App.-Texarkana 1993, writ denied). I believe the Texarkana Court was simply wrong when it held that because the notice of the first setting was ineffectual that the second setting "must necessarily be considered a first setting." Id. at 140-41.
Citing Bell, the Tyler Court of appeals used the term "ineffectual" in Hardin in 1995, and used it again in Platt in 1999. Hardin v. Hardin, 932 S.W.2d 566, 567 (Tex.App.-Tyler 1995, no pet.); Platt v. Platt, 991 S.W.2d 481, 484 (Tex.App.-Tyler 1999, no pet.). Neither Hardin nor Platt involved a second setting, and thus, did not examine the meaning of the term as applied to a first or second setting.
Rather than the vague term "ineffectual," I submit the proper term is "defective." Notice of a first trial setting that is less than 45 days is defective. But notice of a first trial setting that is less that 45 days is still notice. It is still notice of the first trial setting. When properly objected to, the defective notice may be corrected by providing "any reasonable notice" of the second or subsequent setting. Tex.R. Civ. P. 245. A defective notice may be corrected by a later setting and notice that complies with due process. And, if not properly objected to, like most defects, the defect in the first setting is waived. Tex.R.App. P. 33.1.
There was a notice of a first setting in this case. After deducting three days for service by mail, the notice provided only 42 days notice of the first trial setting. Spencer properly objected to the defective notice and moved for a continuance based upon the failure to give a full 45 days notice of the first setting. The continuance was granted. The trial date was reset during the same hearing immediately after the trial court granted the continuance. No objection was made to the length of notice given or date set for the second setting until several weeks later. Twelve days prior to trial, and then again 4 days prior to trial, Spencer moved for a continuance arguing there had been no setting that provided at least 45 days notice. The Rule only requires 45 days notice for a first setting. The second and third motions for continuance were attacking the sufficiency of the notice for the second trial setting. Thus, the trial court did not err in overruling the second and third motions for continuance which were based on the misdirected argument that the second setting provided less than 45 days notice in violation of Rule 245.

EVIDENCE PECULIAR TO THIS CASE
The majority also addresses the admissibility of photographs because the same issue may arise during trial on remand. Because this issue is essentially peculiar to this case I will limit my comments expressing my disagreement with the majority's analysis. The majority focuses only on whether the evidence of prior poor housekeeping is relevant to a determination that Spencer violated one of the predicate acts alleged as a basis for termination of her parental rights. The majority ignores the relevance of Spencer's ability, or inability, to maintain an appropriate environment in which to raise children and its relevance to *641 the issue of the best interest of J.B. While the relevance of good housekeeping may have been remote in time to the events surrounding termination, this goes to the weight and not the admissibility of the photographs. I would hold the trial court did not abuse its discretion in admitting the photographs of prior places where Spencer had lived.

RELIEF BEYOND THAT REQUESTED
As previously noted, the majority has granted relief not requested by either party. The majority has set a new calendar from which to compute the mandatory dismissal date. The mandatory dismissal date is one of many factors that the trial court must consider when setting a trial date in termination cases. See Tex. Fam.Code. Ann. §§ 263.401, 263.403 (Vernon Supp.2002). The trial court was aware of this statutory deadline by which a judgment had to be signed or certain actions taken. The trial court was concerned about having to return J.B. to the environment from which the child was taken if the judgment was not signed by the extended dismissal date. The attorney ad litem argued that it was in J.B.'s best interest to go to trial and get the issue of termination resolved. The trial court had to decide between additional discovery for the mother, versus J.B.'s best interest. Because I do not find that the trial court abused its discretion in denying the second and third motions for continuance on the basis that Spencer had not received a notice of 45 days, I do not have to craft a remedy regarding the mandatory dismissal date. The majority has, however, crafted a remedy to avoid the statutory consequences of reversing this case. Neither party has requested that we extend the dismissal date. I believe that the majority errs in granting relief that no party has requested.

BROAD FORM SUBMISSION
Finally, I must comment on the majority's decision to avoid deciding this case on one of the other issues presented. The majority has a clear holding in this court's precedent to reach the same result, but for some inexplicable reason has chosen to avoid disposing of this case on that issue. The eighth issue is: "Does it violate appellant's due process and due course of law rights for their parental rights to be terminated based on disjunctive allegations of conduct, but answered only on a broad form question?" This court has previously held the answer to this issue is: "Yes." In the Interest of B.L.D., 56 S.W.3d 203 (Tex.App.-Waco 2001, pet. granted). But yet, the majority declines to resolve this case on this clearly established precedent. I dissented from the court's decision in B.L.D., and will continue to note my dissent on opinions decided on that basis until the precedential value of B.L.D. is resolved. It does seem odd, however, that the majority would choose to launch into murky water to resolve this case on a controversial theory when they could anchor the result to an issue directly presented in the case at hand. It leaves a discerning reader to wonder why.

CONCLUSION
The majority reverses the case on Spencer's first issue and then proceeds to address several other issues they think may occur on remand. No useful purpose would be fulfilled to state further disagreement with the majority on their discussion of the other issues they have addressed or to discuss the issues they have not addressed. I would overrule Spencer's issue regarding the notice requirements of Rule 245 and the issues challenging the admission of Dr. Shinder's testimony and the *642 other evidence discussed. Accordingly, I respectfully dissent.
NOTES
[1] The decree is a final, appealable judgment because the court previously signed an interlocutory decree terminating the parental rights of J.B.'s father on September 22 and the final decree contains a standard Mother Hubbard clause. See Lehmann v. Har-Con Corp., 39 S.W.3d 191, 203-04 (Tex.2001).
[2] Although we will reverse this case because of the notice issue, we must first address Spencer's issues which would afford her the greatest relief. See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co., 995 S.W.2d 675, 677 (Tex.1999) (per curiam); Monsanto Co. v. Davis, 25 S.W.3d 773, 780 (Tex.App.-Waco 2000, pet. dism'd w.o.j.).
[3] Spencer contends in her third and fourth issues respectively that the record contains no evidence or factually insufficient evidence to support the jury's findings that she (1) engaged in conduct or knowingly placed J.B. with persons who engaged in conduct which endangered his physical or emotional wellbeing and (2) failed to comply with the court's temporary orders. See Tex. Fam.Code. Ann. § 161.001(1)(E), (O) (Vernon Supp.2002).
[4] Such evidence likewise has no relevance to the issues of whether Spencer engaged in conduct or knowingly placed J.B. with persons who engaged in conduct which endangered him and whether Spencer violated the court's temporary orders.
[5] The trial court granted Spencer a running objection as to testimony regarding "anything that occurred prior to [J.B.'s] birth."
[6] Tustin was assigned to Spencer's case until October 1998 when CPS closed its case. By that time, the children were in their father's custody.
[7] At the beginning of the police sergeant's testimony, Spencer re-urged her objection to testimony regarding events occurring before J.B.'s birth. The trial court confirmed that her running objection continued.
[8] Love's testimony that Spencer's apartment was "in total disarray" on her later visit is consistent with Tustin's testimony that things "rapidly disintegrated" for Spencer in early 1998.
[9] Spencer states her fifteenth issue broadly enough to include the testimony of two other expert witnesses as well. However, her brief focuses almost exclusively on Dr. Shinder's testimony. Accordingly, we discuss only Dr. Shinder's testimony in connection with this issue.
[10] See, e.g., JCPenney Life Ins. Co. v. Baker, 33 S.W.3d 417, 427 (Tex.App.-Fort Worth 2000, no pet.); Honeycutt v. KMart Corp., 1 S.W.3d 239, 243-44 (Tex.App.-Corpus Christi 1999), rev'd, 24 S.W.3d 357 (Tex.2000) (per curiam); Richard T. Stillwell, Monitoring the Opinions of Biochemists and Beekeepers: The Application of Daubert & Robinson to Engineering Witnesses in Texas, 51 Baylor L.Rev. 95, 96 n. 6 (1999).
[11] In fact, the Court recognized when it decided Robinson that the factors it enunciated therein could not be rigidly applied in every case:

We emphasize that the factors mentioned above are non-exclusive. Trial courts may consider other factors which are helpful to determining the reliability of the scientific evidence. The factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable will differ with each particular case.
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex.1995).
[12] "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex.1997); accord Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.2001); see also Judge Harvey Brown, Eight Gates for Expert Witnesses, 36 Hous. L.Rev. 743, 811-875 (1999).
[13] "[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology." Havner, 953 S.W.2d at 714; accord Helena Chem. Co., 47 S.W.3d at 499; see also Brown, 36 Hous. L.Rev. at 778-804.
[14] "The district court [i]s not required ... `to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.'" Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex.1998) (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508, 519 (1997)); see also Brown, 36 Hous. L.Rev. at 804-11. The phrase "ipse dixit" literally means "he himself said it." Black's Law Dictionary 743 (5th ed.1979). When used as in Gammill, the phrase refers to" a bare assertion resting on the authority of an individual." Id.; see, e.g., Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 808 (Tex.2002) ("Gholson's `bald assurance' that he was using the widely accepted approach was not sufficient to demonstrate that his opinion was reliable.").
[15] "I asked specifically, `What are you working on? What do you see each of the children doing in the future? How are you helping them with personal interests?'"
[16] "That's a specific area of questioning, `What's your greatest regrets about how you raised your oldest child or your second child ...?'"
[17] Dr. Shinder's assessment focused on the children's physical, emotional, medical and spiritual needs. His inquiry appears to have focused on Spencer's ability to recognize, assess, and address these needs. Some of the specific questions cited include: "How many hours of sleep does a child need at night?"; "Have you had that condition evaluated by a physician or audiologist...."
[18] "If you were unable to take care of your children for a period of time, who would assist you? How much support do you have from your mother, your father, et cetera?"
[19] "I questioned her regarding routines and things of this nature, setting of limits, expectations...."
[20] "Tell me about a recent situation when you dealt with-had an emergency with your children. Tell me how you dealt with it."
[21] This area of the assessment appears to have focused on the "quality time" Spencer spent with each of her children and her ability to listen to and communicate with them.
[22] "Does mayonnaise spoil if it's not refrigerated?"
[23] Dr. Shinder described Spencer's "personality problems" in this manner:

To quickly summarize, she's a person who appears to have very poor coping skills. At times she's very unrealistic. Some are grandiose. There is a history as well as some recent involvement with criminal behaviors, and there was some problems presented within the parenting assessment that would further lead one to question her capacity to be an effective parent.
[24] See In re B.L.D., 56 S.W.3d 203, 213 (Tex.App.-Waco 2001, pet. granted); In re J.O.C., 47 S.W.3d 108, 114-16 (Tex.App.-Waco 2001, no pet.); In re A.M.C., 2 S.W.3d 707, 713-14 (Tex.App.-Waco 1999, no pet.); Spangler v. Texas Dep't of Protective & Regulatory Servs., 962 S.W.2d 253, 258-59 (Tex.App.-Waco 1998, no pet.); In re D.L.N.. 958 S.W.2d 934, 939 (Tex.App.-Waco 1997, pet. denied); Lucas v. Texas Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 503 (Tex.App.-Waco 1997, pet. denied).
[25] As we observed in Bishop, the Governor's Committee was especially concerned with children languishing in foster care for extended periods of time with no clearly defined permanency plans. See In re Bishop, 8 S.W.3d 412, 416 (Tex.App.-Waco 1999, orig. proceeding [mand. denied]).